1             IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2

3  UNITED STATES OF AMERICA,      Criminal Action
                       No. 1:20CR208-1

4       Plaintiff,

5  vs.                 Durham, North Carolina
                       October 2, 2020

6  ALEXANDER HILLEL TREISMAN,

7

       Defendant.

8  _____/

9        **PROCEEDINGS TAKEN FROM AN AUDIO RECORDING**

10  **TRANSCRIPT OF ARRAIGNMENT and DETENTION HEARING PROCEEDINGS**
         BEFORE THE HONORABLE JOE L. WEBSTER

11           UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Government:  CRAIG PRINCIPE, AUSA
                  Office of the U.S. Attorney

14                 101 S. Edgeworth Street
                 Fourth Floor

15                 Greensboro, North Carolina 27402

16

  For the Defendant:   SAMUEL J. RANDALL, IV, ESQUIRE

17                 Randall & Stump
                 2125 Southend Drive

18                 Suite 253
                 Charlotte, North Carolina 28203

19  and
                 LAURA M. COBB, ESQ.

20                 Olinski Law Firm
                 67 Cabarrus Avenue W

21                 Concord, North Carolina 28025

22  Court Reporter:      J. Calhoun, RPR
                 Room 122, U.S. Courthouse Building

23                 324 West Market Street
                 Greensboro, North Carolina 27401

24

25       Proceedings reported by stenotype reporter.
      Transcript produced by computer-aided transcription.

# I N D E X

**GOVERNMENT WITNESSES:**          **DIRECT**    **CROSS**    **REDIRECT**

Special Agent Aaron Seres              5           35

Special Agent Addison Friedman    42           78           89


**Government's Exhibits**                **ADMITTED**

    1                                      47

    2                                      47

<u>**P R O C E E D I N G S**</u>

1

2          (Defendant was present.)

3          **(THE FOLLOWING PROCEEDINGS WERE TRANSCRIBED FROM AN**

4  **AUDIO RECORDING.)**

5          **MR. PRINCIPE:**  The next matter is Alexander Hillel

6  Treisman, 1:20CR208-1.  He is represented by Samuel Randall and

7  also represented by Laura Cobb.

8          Your Honor, the matter is on for an arraignment on a

9  superseding indictment, as well as a detention hearing.

10          **THE COURT:**  All right.  Good morning, Mr. Randall,

11  and, Ms. Cobb --

12          **MS. COBB:**  Yes, Your Honor.  Good morning.

13          **THE COURT:**  And Mr. Treisman, good morning.

14          Counsel, have you all had the opportunity to review

15  the indictment with your client?

16          **MR. RANDALL:**  Yes, Your Honor.  Both the indictment

17  and the superseding indictment.

18          **THE COURT:**  And the superseding indictment.  Have you

19  explained the nature of the charges to your client, and do

20  believe that he understands the nature of these charges and the

21  penalties that could apply to him?

22          **MR. RANDALL:**  Yes, Your Honor.

23          **THE COURT:**  Mr. Treisman.

24          **THE DEFENDANT:**  Yes, sir.

25          **THE COURT:**  Your counsel has indicated to me that he

1  explained the indictment, superseding indictment to you, and

2  that you understand the nature of the charges and penalties

3  that could apply to them.  Is that correct?

4          **THE DEFENDANT:**  Yes, it is, Your Honor.

5          **THE COURT:**  All right.

6          Counsel, how does your client plead?

7          **MR. RANDALL:**  At this time, he intends to plead not

8  guilty.

9          **THE COURT:**  Thank you.  You may be seated.

10          Are you ready to proceed with the detention hearing?

11          **MR. RANDALL:**  We are, Your Honor.  Just as a

12  housekeeping matter, I think that the computer system had

13  automatically set a court date for Monday for arraignment on

14  the superseding indictment.  I just wanted to point that out to

15  the Court.

16          **MR. PRINCIPE:**  That is correct, Your Honor.  It is my

17  understanding, that because the case originated with a

18  complaint, when the superseding indictment issued, there was a

19  notice that went out.  Our collective understanding was that we

20  would address the arraignment here today.

21          **THE COURT:**  All right.  Yes, sir.

22          Is there anything else that needs to be addressed

23  about the arraignment?

24          **MR. RANDALL:**  No, Your Honor.

25          **THE COURT:**  All right.  Thank you.

1          All right.  You may call your witness.

2          **MR. PRINCIPE:**  Thank you, Your Honor.  Government

3   would first call Special Agent Aaron Seres.

4          **(SPECIAL AGENT AARON SERES, GOVERNMENT'S WITNESS, WAS**

5   **SWORN.)**

6                      **DIRECT EXAMINATION**

7   **BY MR. PRINCIPE:**

8   **Q.**   I apologize, I might have mispronounced your name.  Can

9   you please state our full name for the Court.

10  **A.**   Aaron Seres.

11  **Q.**   And what is your current position?

12  **A.**   I'm currently an Assistant Inspector Special Agent with

13  the FBI in Washington, D.C.

14  **Q.**   Okay.  And did you recently change positions?

15  **A.**   I did.

16  **Q.**   And what was your position in May of 2020?

17  **A.**   As of May of 2020, I was a Special Agent in the Charlotte

18  FBI Division on the Violent Crimes Against Children, Human

19  Trafficking, and Civil Rights Squad in Charlotte, North

20  Carolina.

21  **Q.**   Do you have a background investigating cases involving

22  child pornography?

23  **A.**   I have experience investigating cases in child pornography

24  through my squad assignment, yes.

25  **Q.**   Did you become involved in an investigation that later

1    resulted in the indictment of Mr. Alexander Hillel Treisman,

2    for violation of possession of child pornography,

3    transportation of child pornography, in a superseding

4    indictment in 1:20CR208-1?

5    **A.**    Yes, I did.

6    **Q.**    Can you tell the Court how you first became involved in

7    that investigation?

8    **A.**    Sure.   I'm going to refer to some of my notes as I go

9    through, if that's okay.

10              In May of 2020, 28th, the Kannapolis Police

11    Department in Kannapolis, North Carolina, responded to a call

12    where they took into possession a vehicle in Kannapolis, coming

13    back to Mr. Treisman, which was located in the parking lot at

14    Fifth Third Bank.

15              The KPD officers identified the abandoned vehicle as

16    a white van bearing a California license plate.   Ran the plate

17    and the VIN, and looking into the windows, identified weapons

18    and other items located in the van.

19              The vehicle was opened.   They took into possession

20    the van, which included several firearms, books about survival,

21    about making improvised weapons, large amount of cash banded in

22    sealed bags, estimated in hundreds of thousands of dollars.

23    The Kannapolis PD took that vehicle into possession, which was

24    abandoned at the Fifth Third Bank.

25              Subsequently, on May the 28th, 2020, Mr. Treisman

1  returned to the bank location in a green Honda vehicle.  KPD

2  officers were again called, responded to the scene where they

3  engaged with Mr. Treisman, who was taken into custody by the

4  KPD officers, and also his Honda Accord, which he was driving

5  at the time, was taken into custody by KPD, which had

6  electronic devices in it, and handguns as well.

7  **Q.**   Let me stop you for a second, and just back-up and make

8  sure I understand everything.

9          Did bank employees first initiate contact with

10 Kannapolis Police Department?

11 **A.**   Yes.   That's my understanding.

12 **Q.**   And that is a bank branch that was in Cabarrus County,

13 North Carolina, Middle District of North Carolina?

14 **A.**   That's my understanding, yes.

15 **Q.**   Is it accurate that they had asked KPD to tow the vehicle

16 because they believed it to have been abandoned there in the

17 parking lot?

18 **A.**   Yes, sir.   That's correct.

19 **Q.**   Was the initial search conducted under an inventory search

20 because they were going to tow the vehicle?

21 **A.**   Yes, sir.

22 **Q.**   Is it also accurate that the same bank employees contacted

23 KPD when Mr. Treisman showed back up at the bank branch

24 inquiring about the van?

25 **A.**   Employees from the bank contacted KPD.

1  **Q.**  Can you tell the Court specifically what firearms were

2  located in the van and then in his Honda?

3  **A.**    Sure.  So located in the van was a Sig Sauer, serial

4  number 20J041880.

5           An Intratec 9mm Luger, model Tech PC-9, serial number

6  D125073.

7           A lower receiver, Anderson Manufacturing Model AM-15,

8  mutli-caliber, serial number 16195421.

9           Kel-Tec Sub-2000, serial number FTC43.

10          A rifle marked Archangel, possibly a Ruger 22

11 caliber, serial number 25920969.

12          A Russian Mosin, M9130 Bull Dash rifle, serial number

13 RMN042789.

14 **Q.**  During the inventory search of the van, you mentioned that

15 some materials were found inside of the van.

16 **A.**    Yes.  That's correct.

17 **Q.**  Can you tell the Court a little bit more about the written

18 materials inside the van?

19 **A.**    Books.

20 **Q.**  Book or written materials?

21 **A.**    Yes.  Let me refer to my notes, please.

22          Located in the vehicle were several books.  There was

23 a book on survival, bomb making, improvised weapons and on

24 Islam.

25 **Q.**  You also mentioned there was a large quantity of U.S.

1  currency in the hundreds of thousands of dollars.

2  **A.**   Yes.   That's correct.

3  **Q.**   Do you know if any investigator ever determined the source

4  of that money?

5  **A.**   Yes.   Agents with the FBI determined that the money was

6  from a sizable inheritance Mr. Treisman had received, and was

7  withdrawn in cash on or about January 2020, in a bank in Long

8  Beach, California.

9  **Q.**   Okay.   Was there any potentially explosive materials in

10  the van during the inventory search?

11  **A.**   If I remember correctly, if my recall is right, there was

12  a canister of Tannerite, along with ammunition located in the

13  van.

14  **Q.**   Can you tell the Court what Tannerite is?

15  **A.**   It is a binary explosive device often used by target

16  shooters.   Generally popular because it produces a loud bang,

17  and smoke (indecipherable) by a bullet.

18  **Q.**   And it is lawful to possess that, right?

19  **A.**   That's correct.

20  **Q.**   And is it a device or explosive material?

21  **A.**   It is an explosive material.

22  **Q.**   Okay.   Can you tell the Court what specifically was found

23  inside of the Honda Accord in terms of firearms?

24  **A.**   Sure.   Inside of the Honda vehicle, the officers

25  identified a firearm as a Taurus Spectrum 380 caliber, serial

1  number 1F039977.

2          A second firearm inside a clothes hamper, Intratec

3  9mm Luger, serial number 80550018.

4  **Q.**   Is it correct that one of those firearms was concealed

5  inside of the hamper?

6  **A.**   That's correct.

7  **Q.**   Was Mr. Treisman's wallet found inside the vehicle?

8  **A.**   Yes.  In a cup-holder between the seats in the Honda

9  vehicle, they also located Mr. Treisman's wallet.  In addition,

10 the wallet contained several items, including a photograph of

11 Treisman and a drivers license from Washington --

12 identification card from Washington.  A California Drivers

13 License.  A Florida Drivers License.  So two licenses, one

14 identification card.

15 **Q.**   Okay.  Was the Washington identification card in the name

16 of Alexander Hillel Treisman?

17 **A.**   Yes, it was.

18 **Q.**   What date of birth was associated with that ID?

19 **A.**   December 19, 2000.

20 **Q.**   Was the State of California Drivers License also in the

21 name of Alexander Hillel Treisman?

22 **A.**   It was.  Also a date of December 19, 2000, date of birth.

23 **Q.**   What about the Florida Drivers License, was that in the

24 same name?

25 **A.**   It was not.

**Q.**   What name was it in?

**A.**   Alexander S. Theiss, T-H-E-I-S-S.

**Q.**   What was the date of birth on that license?

**A.**   Date of birth, March 29th, 1995.

**Q.**   Whose photograph was on that license?

**A.**   Mr. Treisman.

**Q.**   Was that a true license issued by the State of Florida?

**A.**   It's my understanding, that the license itself is a counterfeit. I can't speak to any further details on the license.

**Q.**   Was Mr. Treisman arrested by the Kannapolis Police Department for carrying a concealed weapon?

**A.**   Yes, he was.

**Q.**   Was anything seized from his person at the time of his arrest?

**A.**   A Samsung S9 cellular phone was seized from his person.

**Q.**   And where was it on his person?

**A.**   I believe it was in his pocket on his person, but I'll confirm, please.

In the right front pant's pocket.

**Q.**   Okay. At some point did the Kannapolis Police Department reach out to the FBI and the Joint Terrorism Task Force in Charlotte?

**A.**   Yes, sir, they did.

**Q.**   Why did they do that?

**A.**    The concern over the materials found in the van led them
to contact the JTTF in regards to Mr. Treisman.

**Q.**    Did those investigators go to meet up with the Kannapolis
Police Department officers?

**A.**    Yes, they did.

**Q.**    Was Mr. Treisman interviewed by Kannapolis Police
Department investigators on May 28, 2020, following his arrest?

**A.**    Yes, he was.

**Q.**    Was he advised of his Miranda warnings?

**A.**    Yes, he was.

**Q.**    Did he waive those rights and agree to speak to
investigators?

**A.**    He did.

**Q.**    Can you tell the Court what information he provided to KPD
investigators.

**A.**    Mr. Treisman was asked about some hand drawings of
swasticas, planes crashing into buildings and other books found
in his van.  Mr. Treisman conveyed to the interviewing officers
that he had an interest in terroristic incidents and mass
shootings and he conveyed that he had watched YouTube videos
and read PDF articles about such incidents.

         He conveyed that many of his friends recently stopped
interacting with him because of remarks and jokes he made in
reference to incidents such as mass shootings and the 911
terrorist attacks.

**Q.** Let me clarify something. Before you mentioned several
books and materials, but now you mentioned drawings of
swasticas and planes crashing into buildings. Were those also
found in the van?

**A.** That's my understanding.

**Q.** Following the interview that was conducted by the
Kannapolis Police Department, was an interview later conducted
by FBI investigators with the Joint Terrorism Task Force?

**A.** Yes, sir.

**Q.** When did that occur?

**A.** The next day.

**Q.** And can you tell the Court, was he also advised of his
Miranda warnings on an Advice of Rights form and waive his
rights?

**A.** Yes. That's correct.

**Q.** Did he agree to talk to those investigators?

**A.** Yes, he did.

**Q.** What were those investigators interviewing him about?

**A.** They were specifically not there about the State charges.
They were there to speak to him about potential terrorism.

**Q.** Okay. What did they ask him, and what information did he
provide at that time?

**A.** They asked him about his international travels.
Mr. Treisman initially denied traveling internationally. Later
he said he traveled to Canada with his mother.

1           He admitted he had an interest in terrorism and reads
2    Wikipedia articles on the subject.
3           He said he had lost friends because of his joking
4    about the incidents such as 911.  He said that he played video
5    games, and he traveled across the country to various locations
6    beginning in Seattle, moving on to Long Beach, California, and
7    other locations where he had purchased some firearms.
8    **Q.**   Did he admit to obtaining the California Drivers License
9    while staying for several weeks in Long Beach, California?
10   **A.**   Yes, he did.
11   **Q.**   Did he indicate where or in which states that he had
12   purchased firearms?
13   **A.**   He had indicated that he stopped in Kansas and purchased
14   two firearms.  He also had traveled to New Hampshire and
15   purchased a firearm.
16          Along the way, he had stopped in Missouri and visited
17   an individual named Gunter, and he stopped in New York City to
18   visit the 911 Memorial.
19          He continued his travel on to West Virginia, where he
20   purchased another firearm and traveled through Virginia into
21   North Carolina, where he stopped in Fayetteville and met with
22   Mr. Gunter.
23   **Q.**   So he met up with the same person named Gunter who he had
24   previously visited in St. Louis, Missouri?
25   **A.**   That's correct.

**Q.** Where did they meet up at?

**A.** They met in Fayetteville and went to a firearms range, Range 56.

**Q.** And are you familiar with Range 56?

**A.** Not personally, no.

**Q.** Did you receive some information about why they visited Range 56?

**A.** Yes.  To have firearms practice.

**Q.** Did Mr. Treisman confirm using any online aliases during that interview?

**A.** He did.  He utilizes the alias Flippy Mapper on YouTube. It is F-L-I-P-P-Y M-A-P-P-E-R.

**Q.** Did the investigators also show Mr. Treisman a Reddit post during that interview?

**A.** They did.

**Q.** Could you tell the Court about that?

**A.** Sure.  It was a comment in Reddit on or about February of 2020 by user AlextheBodacious.  The conversation went such as, "How do I dox in Sub Rosa.  I keep dying and being called a pedo and want to kill people in real life about it.  How can I find the address of those I hate and execute them for their crimes?"

**Q.** And the reference to "pedo" there, did the investigators have a view in terms of what that was in reference to?

**A.** Short term for pedophile.

**Q.**   What did Treisman say when confronted by this post?

**A.**   In the interview with JTTF officers, he initially stated he could not recall using the name of AlextheBodacious, or posting the statement.  He was asked again directly about it subsequent in the interview about his user name of AlextheBodacious, and he said and affirmatively nodded to that question and stated he could not recall.

He was later asked what his intent was on the statement in Reddit, and claiming he could not recall using aliases.  He replied, "for shock factor."

**Q.**   So he stated that he made the post for shock factor, but he had previously denied using that alias and making that statement.

**A.**   That's correct.

**Q.**   Did investigators identify any information about Mr. Treisman associated with a U.S. Passport Application?

**A.**   They did.

**Q.**   What did they determine?

**A.**   Our investigators determined that in a U.S. Passport Application for Mr. Treisman, he listed an email address AlextheBodacious@gmail.com.

**Q.**   Was an Open Source search conducted on that email address?

**A.**   It was.

**Q.**   And what was the result of that search?

**A.**   At the time, the email address and prefix identified with

1  a Reddit account with that online alias.

2  **Q.**    And what is Reddit?

3  **A.**    It is an online forum for posting and communication.

4  **Q.**    Were investigators able to determine that Treisman used

5  the alias, AlextheBodacious on other platforms?

6  **A.**    Yes, they did.

7  **Q.**    Could you give another example?

8  **A.**    Sure.  He used the same alias, Alexthebodacious,

9  Mr. Treisman, on a Steam gaming platform pursuant to

10  information received by an individual who interacted with him

11  on the platform.

12  **Q.**    So that individual was interviewed by the FBI?

13  **A.**    That's correct.

14  **Q.**    Was that Shawn Adams?

15  **A.**    Yes, it is.

16  **Q.**    Did the investigators also interview Mr. Treisman about

17  the firearms?

18  **A.**    They did.

19  **Q.**    And what did he tell them?

20  **A.**    Mr. Treisman stated that he had purchased the firearms in

21  New Hampshire through a seller he had met on ArmsList.com.

22  **Q.**    Which firearm are we talking about?

23  **A.**    This is for the Sig Sauer AR rifle.

24  **Q.**    Okay.

25  **A.**    Specifically, he stated he could not recall if he accessed

1  the website via cell or computer.  He was pretty sure that the
2  seller was a resident of New Hampshire.
3          Mr. Treisman explained the scenario where he bought
4  the weapon, stated he met the seller in the parking lot,
5  purchased the rifle for $800, and it was a 556 caliber rifle.
6  He stated he could not recall the seller's name.
7          Treisman stated he was living in a hotel in New
8  Hampshire during the purchase of this firearm.  He stated he
9  had bought this firearm in the past couple of weeks between
10 California and the current date of the interview, which was
11 believed to be March 2020, in terms of the timing of the
12 purchase.
13 **Q.**   Okay.  Did he explain anything about the Intratec 9
14 firearm?
15 **A.**   In regards to the Intratec 9, Mr. Treisman was questioned
16 and stated he had bought it off a Kansas Arms List as well.  He
17 stated he purchased the firearm loaded with a round in the
18 chamber, and he bought it approximately last year or so.  He
19 did not recall the name of the individual.  It was a guy he
20 thought he bought it from.
21 **Q.**   What did Mr. Treisman say about the Kel-Tec Sub-2000
22 firearm?
23 **A.**   In regards to the Kel-Tec, Mr. Treisman originally stated
24 he bought the firearm in Kansas, and then he corrected the
25 statement identifying that he had purchased this firearm from a

1   home-based federal firearms licensee in Seattle, Washington.

2           He told agents he bought some other guns in Kansas,

3   but not this one.  Treisman told agents that he had bought this

4   firearm off Arms List, but through a federal firearms licensee,

5   also known as FFL.  Treisman stated he did a background check

6   and everything and came back clear.

7           He was further asked about what identification was

8   utilized to purchase this firearm, and he responded, he did not

9   recall.

10          THE JTTF investigator asked if he utilized the

11  Florida license that we discussed earlier.  He responded, No,

12  not that I recall.  When shown a copy of the Florida Treisman

13  counterfeit photo drivers license and asked why he had

14  different information about the purchase than the individual

15  who sold it to him, Treisman told the agent he wasn't saying

16  that he didn't use the license, he just said he did not recall.

17  **Q.**   Okay.  Had JTTF investigators obtained a copy of an ATF

18  form from that FFL dealer?

19  **A.**   Yes, they did.

20  **Q.**   What did that form show?

21  **A.**   The ATF form 473, lists the purchaser as Alexander, no

22  middle name, Theiss, T-H-E-I-S-S, with a date of birth March

23  29, 1995.

24  **Q.**   And was that the same information that was on the -- you

25  said counterfeit Florida Drivers License?

**A.**     Yes, it was.

**Q.**     What did Mr. Treisman say about the Taurus Spectrum pistol?

**A.**     Mr. Treisman, in the same interview, stated he bought the firearm within the past couple weeks in West Virginia from a seller he met on Arms List.  He stated he thought it was brand new because the seller sold it to him in the box with the manual for $200.  He also could not recall the seller's name or seller's handle on ArmsList.com.

**Q.**     Did investigators later do an online search for aliases resulting in the discovery of another Reddit post?

**A.**     Yes, it did.

**Q.**     Can you tell the Court about that?

**A.**     An additional Reddit post by user AlextheBodacious, read as follows, "Toolhead, more like narcissistic bitch who can't take an insult (indecipherable) will die in the (inaudible) of 25.  First post in six months.  But let me tell you, fuck, Toolhead, I hate him.  He dishes it out but he can't take him. I called him a mouse furry and a wakey cuck, c-u-c-k, virgin, and he banned me from his Mine Craft server.  I'm shook.  I want to do a school shooting.  What do I do?"

**Q.**     Additionally, was an interview conducted with Shawn Adams?

**A.**     Yes, sir, it was.

**Q.**     Can you tell the Court about that?

**A.**     Sure.

**Q.** When was that? Roughly when was that interview conducted?

**A.** Approximately May 30 of 2020.

**Q.** And where was that conducted?

**A.** It was conducted in the St. Louis Missouri area.

**Q.** Was that by FBI agents from the St. Louis Division?

**A.** Yes. That's correct.

**Q.** And what did they find out from that interview?

**A.** Adams described Mr. Treisman as an outcast who seemed to be driving around the country. He remained in contact with Treisman even though he stated he felt put off by Treisman's racist comments and apparent interest in mass shootings.

Treisman made many comments about, "hating niggers and talked of killing African-Americans." Treisman spoke about mass shootings in a positive way and seemed interested in past school shooters, such as those at Columbine.

During the interview, Adams was able to access his cellular information and identified contact information, tag names and other information relative to his contacts with Mr. Treisman.

**Q.** Did he also provide a phone number for Mr. Treisman?

**A.** He did. He provided the contact phone number for Mr. Treisman as area code 206-293-0658, and the user name AlextheBodacious, from the Steam gaming website.

**Q.** Was that phone number later associated with the cell phone that was seized from Mr. Treisman incident to arrest?

**A.**    Yes, it was.

**Q.**    Did Mr. Adams say anything about visiting Mr. Treisman in Los Angeles?

**A.**    He did.

**Q.**    What did he tell the investigators?

**A.**    He said that Mr. Treisman had paid for Mr. Adams to fly out to Los Angeles, California.  He spent a few days driving around California and just spending time together, and described Treisman as strange and made comments about shooting homeless people, Mr. Treisman did.  At one point, Mr. Treisman referred to shooting homeless as, "taking out the trash," and Adams noted that Treisman was extremely interested in mass shootings.

**Q.**    Did he report that Mr. Treisman made some comment about murders during the visit?

**A.**    He did.  Mr. Adams conveyed that while in Hollywood, California during the trip, they were hiking on a trial to the Hollywood sign that overlooks the city.  Mr. Treisman said, 30 percent of murders go unsolved.  Mr. Adams was becoming more uncomfortable and put off by Treisman.

He denied seeing any guns with Mr. Treisman on the trip, but then subsequent on a trip, Treisman told Mr. Adams that he, Mr. Treisman, would have definitely done a school shooting in Seattle if he would not have left the city.

**Q.**    Did he discuss meeting with Mr. Treisman in April of 2020

1  in Fayetteville, North Carolina?

2  **A.**   He did.

3  **Q.**   What did he report about that?

4  **A.**   During the trip in April of 2020 near Fayetteville, North

5  Carolina, Mr. Adams recalled seeing three guns in the

6  possession of Mr. Treisman. He and Mr. Treisman fired the

7  three guns while at the firing range. Mr. Adams described the

8  guns as an AR style rifle, 223 caliber. An AR style with

9  clasps on the stock, and a 9mm handgun with Ruger magazines.

10       While Mr. Treisman was firing his weapons at the

11  range with Mr. Adams, he would call out the names of well-known

12  mass shooters, such as the Columbine shooters as he pulled the

13  trigger.

14  **Q.**   Did he also show investigators a text message that he had

15  received from Mr. Treisman?

16  **A.**   He did.

17  **Q.**   And what was the subject of that text message about?

18  **A.**   It was a text message received from Mr. Treisman utilizing

19  phone number 206-293-0658, same phone number we already

20  discussed, on May 25th, 2020. Treisman's message said, "Epic

21  school shooting," and described the message as something

22  typical that Treisman would say when talking about school

23  shootings in a positive manner.

24  **Q.**   Was a search warrant then obtained for the Samsung S9 cell

25  phone, subsequently?

**A.**     Yes.

**Q.**     Was it obtained by the FBI?

**A.**     Yes.  On June 3rd, 2020, the FBI obtained a search warrant for the Samsung S9 cell phone.

**Q.**     For investigation of what crimes?

**A.**     Initial search warrant for the device was for violation relative to Title 18, 924(b) which was receiving and transporting firearms and ammunition in interstate commerce with the intent to commit a felony, and Title 18 U.S.C. 922(a)(6), providing false information to a firearms dealer in the acquisition of a firearm.

**Q.**     And when that phone was searched, was the phone number we previously discussed determined to be the phone number associated with that device?

**A.**     Yes, it was.

**Q.**     Can you tell the Court what happened when the device was searched?

**A.**     Yeah.  So the agents in the FBI initially began their search of the device for the materials as described, and upon doing the search, identified several potentially explicit sexual images appearing to be of minors, and requested myself as an agent from the Violent Crimes Against Children Squad, to come and examine the images they came across.

**Q.**     Is that what you did?

**A.**     I did.

**Q.** Can you give the Court an example of some of the images that you saw when reviewing the device?

**A.** Sure. So upon my review, a few examples of images that I identified, one image appeared to be a nude female, appearing to be under the age of 12, with two hands grasped around what appeared to be an adult penis.

The second image I identified initially was a nude female appearing to be under the age of 14, providing a hand job to what appears to be an adult male penis.

The third image I initially identified was a female, appearing to be under the age of 14, nude from the waist down, shown digitally penetrating her own vaginal.

An image of a female vagina, appearing to be of a minor, with what appears to be an adult penis partially penetrating the vagina. The image is cropped in a way essentially to just show the vaginal area.

Image of two nude females, appearing to be under the age of 14, both in a sexually explicit pose, via a webcam. One of the female's vagina can be clearly viewed in the image.

**Q.** Okay. Did you obtain another search warrant after discovering those images on the device?

**A.** I did.

**Q.** And what did you obtain that search warrant for?

**A.** The search warrant was to examine the Samsung S9 device for child pornography.

1 **Q.** And that would be in violation of 18 U.S Code

2 2252A(a)(5)(B)?

3 **A.** That's correct.

4 **Q.** And is that what you did?

5 **A.** I did.

6 **Q.** And can you tell the Court about the search of the Samsung

7 device?

8 **A.** The Samsung device, the focus of the search was primarily

9 as we do in most child crimes cases, to review the images and

10 the videos on the device, to identify all evidence of the child

11 pornography, which is what I did.

12 We utilize a review system to do so within our

13 building due to the sensitivity and nature of the materials

14 that we're looking at. I conducted that review of the Samsung

15 S9, identifying a large amount of additional videos and images

16 that I cataloged relevant to the violations of 2252A.

17 **Q.** Okay. Were there other computers, laptops or digital

18 media devices or cell phones that were seized from the van or

19 the Honda that Mr. Treisman was in possession of on May 28,

20 2020?

21 **A.** Yes, sir. In addition to the Samsung S9 phone initially,

22 there was an additional total of 15 extra devices, so 16 in

23 total, including the Samsung device.

24 **Q.** Was another search warrant obtained to search those

25 devices for child pornography?

**A.**    Yes, it was.

**Q.**    Was that search warrant issued?

**A.**    Yes, it was.

**Q.**    And did you or other members of the FBI conduct a search of those devices for child pornography?

**A.**    Yes, we did.

**Q.**    Can you tell the Court what each device in particular child pornography was found on?

**A.**    Sure.  So of the total 16 devices, nine of the 16 devices had identified, through review of the FBI, child pornography images on them.  I'll just list down the devices for the record.

         The first device would have been the Acer Aspire laptop.  Bar code numbers are probably the easiest to provide for a descriptor.  E6405360.

         The second item where I identified child pornography was a Seagate 8 Barracuda two terabyte hard drive, serial number ZFL1DB0W.

         The third was a Seagate Pipeline HD 500 gigabyte hard drive, serial number 6BBNYW3T.

         The fourth device was a silver Lenovo Idea 320 laptop, just identified as bar code item E6405350.

         The fifth item was a Scan Disk 128 gigabyte flash drive, bar code E6405348.

         The sixth device was a Samsung S9 as described,

1   associated with 206-293-0658.

2           The seventh item was ZTE cell phone, 32C37446119A.

3           The eighth item was an HP laptop computer, serial

4   number 5CD9294TKB.

5           The last item was a Seagate one terabyte hard drive,

6   serial number WDE9LNGH.

7   **Q.**   And each of those devices you just testified about, in the

8   determination of FBI, contained child pornography?

9   **A.**   Yes, sir.

10  **Q.**   Can you give the Court the definition of child pornography

11  that is applied relevant to the statutes that were being

12  investigated?

13  **A.**   Child pornography for the purposes of our investigation,

14  we have to divide it into two primary categories in regards to

15  the definition of child pornography.

16          Is that what you would like me to speak to?

17  **Q.**   Yes.  If you would.

18  **A.**   For the purposes of categorization, we have a

19  characterization of child pornography S&M, which is defined as

20  files that contain child pornography involving any of the

21  following, and I'll read them for the record.

22          Children included in the file ranging from

23  prepubescent, which is zero to 12 years of age, to

24  postpubescent, 12 to 17 years of age, involving torture or

25  other acts falling in the definition of sadism and masochism,

1  also known as S&M.

2        Children ranging from prepubescent, zero to 12 years

3  of age, to postpubescent, 12 to 17, having pain inflicted upon

4  them to include self-induced bestiality, penetration, oral,

5  vaginal, or anal of prepubescent children to include inanimate

6  objects, urination or defecation upon, and sensory depravation

7  of the eyes, ears or mouth or nose in the video or pictures are

8  covered.

9        The secondary definition for categorization purposes

10  of our files that contain child pornography of pre and

11  postpubescent children, but do not otherwise fall into one of

12  those other S&M categories.

13  **Q.**   Based on the evaluation of all of those devices that you

14  testified about, can you give the Court an idea of how many

15  videos or images were found involving child pornography S&M

16  category?

17  **A.**   There were approximately 637 videos and images found in

18  regards to that category.

19  **Q.**   With regard to the child pornography category?

20  **A.**   There was approximately 1,248 videos and 6,721 images.

21  **Q.**   Now did the numbers in the child pornography category

22  include the 637 from the S&M category, or are they separate?

23  **A.**   Those are separate.

24  **Q.**   Could you give the Court just a few examples of the images

25  that were found that involved prepubescent minor or a minor who

1   had not attained the age of 12 years of age?

2   **A.**   Sure.   I have a couple of examples.   I'll read them for

3   the record.   First example would be a photo file, JPG, which

4   depicts a female, approximately 12 years of age, naked and

5   lying on a bed.   The female's arms are across her torso, tied

6   together at the wrist.   Belts are individually wrapped around

7   the female's ankles.

8            A female is sitting on a cutting board with her legs

9   spread apart, exposing her genitalia and an object inserted in

10  the female's anus.

11           The second example depicts a female approximately

12  five years of age.   The female is naked, lying on her back with

13  her legs spread apart.   The female's arms are above her head

14  and tied together at the wrist.   An item was used as a

15  blindfold, and a dog's head is in the area of the female's

16  genitalia.

17           The third example, a female approximately five years

18  old, lying on her back.   The female's hands are above her head

19  with the wrists tied together with a rope and an adult penis is

20  orally penetrating the female.

21           The fourth example depicted a naked female,

22  approximately four years of age.   The female is on her hands

23  and feet looking at the camera.   The female is being penetrated

24  in the anus by an adult penis.

25           The last example is a female, approximately five

1  years of age, naked and lying on her back on the floor.  The

2  female's wrists are attached to clear restraints.  The female

3  is blindfolded, and her legs are spread apart exposing her

4  genitalia.

5  **Q.**    Thank you.  With regard to the Lenovo laptop, where was

6  that device originally seized from?

7  **A.**    The Lenovo laptop was originally seized from the Honda

8  vehicle.

9  **Q.**    And that was the same vehicle that Mr. Treisman had

10 arrived at the Fifth Third Bank driving, correct?

11 **A.**    That's correct.

12 **Q.**    And where was the Samsung S9 cell phone when it was

13 seized?

14 **A.**    Samsung S9 was on Mr. Treisman's person when he was taken

15 into custody.

16 **Q.**    Where were all of the other devices that you testified

17 about that contained child pornography seized?

18 **A.**    They were seized from the van.

19 **Q.**    I would like to ask you about evidence with regard to

20 Counts Two and Three of the superseding indictment that we've

21 referred to that involved transportation of child pornography.

22 **A.**    Yes, sir.

23 **Q.**    With regard to Count Two, which device does that relate

24 to?

25 **A.**    Count Two relates to the Samsung S9 device.

**Q.**   And was at some point a search warrant obtained by the FBI
for cell location data for the Samsung S9 cell phone?

**A.**   Yes, sir.

**Q.**   Was that obtained from cell phone provider?

**A.**   That's my understanding, yes.

**Q.**   Can you tell the Court what those records show with regard
to the movements of that cell phone on or about May 26th and
May 27th, 2020?

**A.**   The cell phone data that was collected identifies movement
amongst South Carolina and North Carolina by Mr. Treisman.
Originally down in South Carolina and traveling into the
Kannapolis area on May 27th of 2020.

**Q.**   So those records show the cell phone in South Carolina on
May 26th, and then in Kannapolis, North Carolina, on May 27th?

**A.**   That's correct.

**Q.**   Was any --  the examination of the cell phone, did it show
any pornography or child pornography that had been downloaded
on or after May 27th, 2020?

**A.**   I'm not aware of any.

**Q.**   With regard to Count Three, does that relate to the Lenovo
laptop?

**A.**   Yes, sir, it does.

**Q.**   Can you tell the Court what that examination of the laptop
showed with regard to images of child pornography on May 28,
2020?

**A.**   Yes.   The Lenovo laptop which was in the possession of
Mr. Treisman, was shown to have, via connection to a hotel
internet that Mr. Treisman was staying at in South Carolina,
logged into a Tor browser utilizing the hotel Wi-Fi and
downloaded child pornography.

**Q.**   Okay.   Was the FBI able to determine when the Tor browser
had been downloaded to the computer?

**A.**   Yes, it was.

**Q.**   Do you know when that was?

**A.**   My understanding, it was the night before May 27th.

**Q.**   Okay.   And was there any other internet connection shown
by evaluating the device after the connection to the hotel
internet in South Carolina?

**A.**   Not that I know of.

**Q.**   Following that connection, Mr. Treisman was then found in
possession of the laptop on May 28th in Kannapolis, North
Carolina.   Correct?

**A.**   Yes.   That's correct.

**Q.**   Did the FBI obtain any hotel receipts from his stay at the
hotel in South Carolina?

**A.**   They did.

**Q.**   What did those receipts show?

**A.**   It showed two night stays, separate receipts.   One in
South Carolina, May 26th to the 27th, and a separate receipt,
May 27th to May 28th.

1    **Q.**    And what guest information was listed on those receipts?

2    **A.**    Alexander Theiss.

3    **Q.**    Do you know what address was used?

4    **A.**    I don't think I have that information.

5    **Q.**    Would looking at a copy of the receipts help you remember?

6    **A.**    Yes, it would.

7              **MR. PRINCIPE:**  May I approach the witness, Your

8    Honor?

9              **THE COURT:**  You may.

10             **THE WITNESS:**  I've looked at the receipt to refresh.

11   The address listed on the receipt is Vine Street in

12   Kissimmee, Florida.

13   **BY MR. PRINCIPE:**

14   **Q.**   Is that the same address that was used on the Florida

15   Drivers License under the alias Alexander Theiss?

16   **A.**    Yes.

17             **MR. PRINCIPE:**  If I could have one moment, Your

18   Honor.

19             **THE COURT:**  All right.

20             **MR. PRINCIPE:**  I have no additional questions for

21   Special Agent Seres.

22             **THE COURT:**  All right.  Cross-examination.

23             **MR. RANDALL:**  Thank you, Your Honor.

24                         **CROSS-EXAMINATION**

25

**BY MR. RANDALL:**

**Q.**   Special Agent Seres, were you personally involved in the search of any of the vehicles?

**A.**   No, sir, I was not.

**Q.**   Any information you have as to those searches, that came from the Kannapolis Police Department?

**A.**   Yes, sir.

**Q.**   During the search are you aware of any federal law enforcement officer being there, or was that just conducted by Kannapolis?

**A.**   I'm not aware of any federal officers there, no.

**Q.**   And prior to obtaining the federal search warrants for these devices, were you aware that the Kannapolis Police Department had obtained search warrants and had done a search of these items?

**A.**   I'm sorry, can you please repeat that?

**Q.**   Sure.  Prior to you obtaining -- or the federal government obtaining a search warrant for these items, were you aware that the Kannapolis Police Department had applied for and obtained search warrants for these devices?

**A.**   I'm aware they applied for a warrant.  I don't know the exact timing of one versus the other that day.

**Q.**   Special Agent Seres, did you conduct the forensic evaluation of any of the electronic devices?

**A.**   Can you explain, when you refer to your question as to

1  forensic examination --

2  **Q.**   Did you hookup any of the devices to Cellebrite or any

3  other type of --

4  **A.**   No, sir.

5  **Q.**   -- yourself.

6        That was done for you at the office?

7  **A.**   That's correct.

8  **Q.**   They are on Microsoft Way down in Charlotte?

9  **A.**   That's correct.

10 **Q.**   And then you said that you had done some type of

11 examination.  What exactly was it that you did?

12 **A.**   So the imagery and videos relative to a device are loaded

13 onto a reviewing station for the special agent assigned to

14 investigate the review.  I went through the images and videos

15 one-by-one, as is required for me to catalog every image.  So I

16 went through one-by-one and gave a descriptor of each one.

17 **Q.**   Prior to doing that, is there any type of software that

18 helps kind of sort down the images and classify them for you?

19 **A.**   There is.  There is some diagnostic run over the imagery.

20 I can't tell you in a technical term the way it operates, but

21 there are some known images of child pornography that the

22 system tries to check against.

23 **Q.**   Are you aware, were there any known child pornography

24 images located on any of these devices?

25 **A.**   I believe there were.

**Q.**   Do you know how many?

**A.**   I can't speak to the number.

**Q.**   Okay.  And the search warrants, were those issued by the Middle District or the Western District?

**A.**   The search warrant for the Samsung device was issued by the Western District of North Carolina.

**Q.**   And then for the other devices, it would have been the Middle District?

**A.**   Middle District of North Carolina, that's correct.

**Q.**   Did you personally interview -- and I apologize, it is difficult to speak through the mask.  Did you personally interview Shawn Adams?

**A.**   I did not.

**Q.**   That was a field officer up where he was living?

**A.**   St. Louis, Missouri area, that's correct.

**Q.**   Is Shawn Adams, is that the same person as Gunter?

**A.**   My understanding is it is a different person.

**Q.**   Okay.  Were you ever able to identify who this Gunter person is?

**A.**   I believe so.

**Q.**   Is Gunter their real name?

**A.**   I believe Gunter is a handle for online use.

**Q.**   Screen name or streamer name?

**A.**   Correct.

**Q.**   As part of the case, I think you had mentioned Reddit

1  posts.  There is also this Sub Rosa game.  What is the Sub

2  Rosa?

3  **A.**   Again, I'm a little aged on some of the tech today, but I

4  will tell you my understanding is, it's an online gaming

5  platform similar to a first person type shooter that you may

6  play on an Xbox or Play Station, but through a computer.

7  **Q.**   Have you actually gone and looked it up?

8  **A.**   No.

9  **Q.**   Fair enough.  So some of the posts that you had spoken

10 about, the Reddit posts, one made reference to banning from a

11 Mine Craft server.  What does that mean?

12 **A.**   Layman's view on it, Mine Craft server, again, I believe

13 it is a video game type of platform that you can play via

14 computer or gaming system.

15 **Q.**   Okay.

16 **A.**   I apologize, I didn't write down the entire quote, but it

17 was AlextheBodacious making comments using words I probably

18 never heard of about being banned from the Mine Craft server.

19 **Q.**   And the other one -- when was that comment made?

20 **A.**   Apologize.  I'm going to try to reference my notes so I

21 can give you an accurate answer.

22 **Q.**   Sure.

23 **A.**   Which one are you specifically inquiring about?

24 **Q.**   The one about being banned from the Mine Craft server.

25 **A.**   I apologize.  I shuffled my papers for one second.

1  **Q.**    I do that all the time.  Take your time.

2  **A.**    The comment was posted a year ago by the user

3  AlextheBodacious on Reddit.

4  **Q.**    Okay.  And then there was another comment that you had on

5  Reddit that you had talked about.  When was that comment made?

6  **A.**    That was a Reddit post in regards to the Sub Rosa in or

7  around the end of February 2020, by AlextheBodacious.

8  **Q.**    So both are comments dealing with online video games, or

9  online video games are referenced in there?

10  **A.**    A component of the comment is online gaming, yes.

11  **Q.**    All right.  And when interviewed, he had said that he made

12  these posts for shock value or shock factor, I think is what

13  you had said.

14  **A.**    Yes.

15  **Q.**    Okay.  And then you had mentioned something about a

16  streaming game platform.  What is that?

17  **A.**    My understanding, it is a similar online type platform for

18  either gaming or connectivity with others online.

19  **Q.**    Okay.  Did Mr. Adams, when he was interviewed, did he

20  indicate how he knew Alex or how they had met?

21  **A.**    He may have.  I don't recall.

22  **Q.**    And at some point, Alex flew Shawn out to California in

23  March of this year.

24  **A.**    I believe that was my understanding, yes.

25  **Q.**    Okay.  And then again in April he flew him to

1  Fayetteville, North Carolina.

2  **A.**   Fayetteville, North Carolina, correct.

3  **Q.**   Between the March trip and the April trip, did Mr. Adams

4  reach out to anyone and say, hey, I want to let you know about

5  Alex, he's made vial, you know, allegations of what he may or

6  may not do?

7  **A.**   I'm not aware of that.

8  **Q.**   Okay.  Did he indicate after the trip to California, that

9  he was concerned or put off or how would you describe his

10 feelings towards Alex at that time?

11 **A.**   He described it as -- it is my understanding, as feeling

12 like he wanted to create some space because he was put off by

13 some of the commentary by Mr. Treisman.

14 **Q.**   But then he met him in Fayetteville a month later.

15 **A.**   He did.

16 **Q.**   And you had said that they went to the gun range to -- was

17 it to practice or to just shoot firearms?

18 **A.**   I call it practice in my profession, but just to shoot

19 firearms.

20 **Q.**   Okay.  How old is Mr. Adams?

21 **A.**   I don't have his exact age.  If I recall, approximately in

22 his 20's, but I would have to get the specific.

23 **Q.**   And Alex is 20 -- 19?

24 **A.**   December -- approximately 19, 20 years old.

25 **Q.**   And the Florida Drivers License, that would make him,

1  what, 24?

2  **A.**  '95 to present, so approximately 24, 25, yes.

3  **Q.**  Did any one speak with Alex's mother as part of your

4  investigation?

5  **A.**  I'm unaware.

6  **Q.**  You're not aware.  Okay.

7  **A.**  We may have.  I just don't recall.

8  **Q.**  I understand that.  At any point during your

9  investigation, were you made aware that Alex had been diagnosed

10 with Autism Spectrum Disorder or Asperger's?

11 **A.**  I'm not aware.

12 **Q.**  Have you ever had a case involving somebody with autism

13 spectrum disorder?

14 **A.**  No, sir.

15 **Q.**  And you're now in main justice up in DC; Washington, DC,

16 correct.

17 **A.**  Washington, D.C.  Correct.

18 **Q.**  What are you doing up there now?

19 **A.**  I'm an assistant inspector for the FBI's Inspection

20 Division.

21      **THE COURT:**  Mr. Randall, if you could try a little

22 harder to keep your mask on when you are talking.

23      **MR. RANDALL:**  Yes, sir.  It is hard to breathe and

24 enunciate.  I apologize.

25      **THE COURT:**  I understand that.  Do you need a break

1 right at this moment?

2         **MR. RANDALL:**  If we could.  Maybe five minutes or so.

3         **THE COURT:**  We'll take a 15 minute recess.

4         **MR. RANDALL:**  Yes, sir.

5         (Recess taken.)

6         **THE COURT:**  Mr. Randall.

7         **MR. RANDALL:**  I have no further questions of this

8 witness.

9         **THE COURT:**  You have no further questions of this

10 witness?

11         **MR. RANDALL:**  No, Your Honor.

12         **THE COURT:**  You may be seated.

13         **MR. PRINCIPE:**  Your Honor, the Government asks to

14 call one more witness.

15         Your Honor, the Government would next call Task Force

16 Officer Addison Friedman with the U.S. Marshals Service and the

17 Joint Terrorism Task Force.

18         **(AGENT ADDISON FRIEDMAN, GOVERNMENT'S WITNESS WAS**

19 **SWORN.)**

20                        **DIRECT EXAMINATION**

21 **BY MR. PRINCIPE:**

22 **Q.**   Can you please state your full name.

23 **A.**   Addison Russell Friedman.

24 **Q.**   Who do you work for?

25 **A.**   United States Marshal's Service.

1  **Q.**   How long have you worked for the Marshal's Service?

2  **A.**   Since 2011.

3  **Q.**   Have you had any other positions in law enforcement?

4  **A.**   I do.  I'm a task force officer with the FBI Joint

5  Terrorism Task Force.

6  **Q.**   Did you become involved in the investigation of the

7  activities of the Defendant, Alexander Hillel Treisman?

8  **A.**   I did.

9  **Q.**   Can you explain to the Court how you and your agency first

10  became involved in that investigation?

11  **A.**   Yes.  As a task force officer for the FBI Joint Terrorism

12  Task Force, I received a call from a Kannapolis Police

13  Department lieutenant, stating that they had a vehicle in a

14  parking lot that had some items of concern.

15  **Q.**   And those items of concern being?

16  **A.**   Material related to Islam, large amount of weapons, large

17  amount of cash.  Drawings and things of that nature.

18  **Q.**   Including Tannerite?

19  **A.**   Including the Tannerite.

20  **Q.**   Did you go to the scene of that location?

21  **A.**   I did.

22  **Q.**   Can you tell the Court what your involvement was?

23  **A.**   Upon my initial arrival, I went to the bank.  There was

24  not much to do at that time.  They informed me that the

25  suspect, the Defendant, had been transported away from the

1  scene and was being taken back to Kannapolis Police Department

2  to be interviewed.

3  **Q.**   With regard to Mr. Treisman, at some point did you,

4  through your investigation, determine his full legal name and

5  date of birth?

6  **A.**   I did.

7  **Q.**   Could you tell the Court what that is?

8  **A.**   Alexander Hillel Treisman, date of birth 12/19/2000.

9  **Q.**   Can you explain to the Court since that initial time when

10  you became involved -- the Joint Terrorism Task Force became

11  involved, has there been a lengthy ongoing investigation with

12  regard to his possession of the firearms and also his apparent

13  intention to commit some kind of act of violence or mass

14  violence?

15  **A.**   Yes.

16  **Q.**   Can you give the Court some idea of the scope of that

17  investigation?

18  **A.**   May I clarify as to what extent you would like --

19  **Q.**   Sure.  Have there been numerous search warrants that have

20  been obtained?

21  **A.**   Yes, sir.  As well as other court orders.

22  **Q.**   Okay.  And what types of things have you pursued or sought

23  during the course of that investigation?  What types of

24  information?

25  **A.**   There has been search warrants for cell phones, an

1  apartment that the Defendant used to reside at in Long Beach,

2  California. Gmail account, and several other accounts

3  associated with the Defendant.

4  **Q.**   Was there a search warrant for cell location information

5  for his Samsung S9 cell phone?

6  **A.**   Yes, sir, I believe there was.

7  **Q.**   Was there court orders to obtain records related to

8  various different social media or gaming platforms?

9  **A.**   I believe so, yes, there was.

10         **MR. PRINCIPE:**  May I approached the witness, Your

11 Honor?

12         **THE COURT:**  You may.

13 **BY MR. PRINCIPE:**

14 **Q.**   (Inaudible due to shuffling papers.)  Government's Exhibit

15 (inaudible) do you recognize what that exhibit is?

16 **A.**   I do.

17 **Q.**   Can you tell the Court what it is?

18 **A.**   It is a slide deck that we put together that has some of

19 the information we've obtained during this investigation.

20 **Q.**   Does that information relate to Mr. Treisman and his

21 (inaudible.)

22 **A.**   It does.

23 **Q.**   I'm showing you what is marked as Government's Exhibit 2.

24 Do you recognize what that flash drive is?

25 **A.**   I do.

1  Q.   What is the contents of that flash drive?

2  A.   It references some of the material in Government's Exhibit

3  1, audio recordings.

4  Q.   Does it include video and audio?

5  A.   It does.

6  Q.   And how many files are on there?

7  A.   I believe there should be four.

8  Q.   Four or five?

9  A.   Correct.

10 Q.   Can you tell the Court what those items are?

11 A.   One of them is a jail call with the Defendant and his

12 mother.

13         A second is an audio recording described as Perfect

14 Porn.

15         The third is a narration of the Defendant at O'Hare

16 Airport.

17         The fourth is a -- the Mandalay Bay incident.

18 Q.   And was there also a video demonstrating the dangerousness

19 of Tannerite?

20 A.   There is.

21 Q.   So five?

22 A.   Five, yes, sir.

23         **MR. PRINCIPE:**  Your Honor, the Government moves to

24 introduce Government's Exhibits 1 and 2 and then to publish

25 those items to the Court?

1     **THE COURT:**  Any objection?

2     **MR. RANDALL:**  Not as to Number 1.  If I can have just

3 a second.

4     For these purposes, no objection to Number 2.

5     **THE COURT:**  They are admitted.

6 **BY MR. PRINCIPE:**

7 **Q.**   I'm showing you slide number one.  Can you tell the Court

8 what that slide shows?

9 **A.**   Yes.  These are images of the white van that was at the

10 bank, as well as the contents of the inside.

11 **Q.**   And what were some of the contents inside the van?

12 **A.**   Tannerite, cash, large amount of cash.  Weapons, hand

13 drawings, books on explosives, books on Islam.

14 **Q.**   Were there drawings as well?

15 **A.**   There were.

16 **Q.**   And what were they of?

17 **A.**   Planes crashing into buildings depicting September 11th.

18 **Q.**   And what is the box depicted in the middle photograph?

19 **A.**   That is the image of the center console next to the driver

20 and the front passenger, with a box of 556 ammo.

21 **Q.**   Was that box full of ammunition?

22 **A.**   I do not know.

23 **Q.**   What does slide number two show?

24 **A.**   These are weapons recovered from the van.

25 **Q.**   And they have been described by the testimony of Special

1  Agent Seres?

2  **A.**    Yes, sir.

3  **Q.**    What does slide number three show?

4  **A.**    This is the image of the Honda Accord and how it pulled

5  into the number two lane of the tellers.

6  **Q.**    Okay.  And do you --  did your investigation determine

7  when Mr. Treisman obtained that vehicle?

8  **A.**    It did.

9  **Q.**    When was that?

10  **A.**    The 26th, two days prior to the date of arrest.

11  **Q.**    So in May of 2020?

12  **A.**    Yes.

13  **Q.**    And do you know how and where he obtained that vehicle?

14  **A.**    What I know is Kannapolis, North Carolina, he met up with

15  another individual, and they brokered the deal at Kannapolis

16  PD.

17  **Q.**    And slide number four, what does this show?

18  **A.**    This is an image of a handgun in the center console area

19  beneath the radio in front of the shift, the shifter.  And then

20  the middle one is the laundry basket or hamper and the one to

21  the far right is the gun that was taken out of that hamper.

22  **Q.**    Slide number five, what does this slide show?

23  **A.**    This is a depiction of the Florida Drivers License and the

24  Washington Drivers License, both with the Defendant's face on

25  them.

1  **Q.**    Okay.  And what names are on those licenses?

2  **A.**    Let me refer to confirm.  Alexander Theiss, T-H-E-I-S-S.

3  **Q.**    Is that what is on both of those licenses?

4  **A.**    Yes, sir, it is.

5  **Q.**    And so those licenses have his picture, but do not have

6  his correct legal name.

7  **A.**    Correct.

8  **Q.**    And did your investigation determine that either one of

9  those identifications were used to purchase firearms in the

10 United States?

11 **A.**    Yes, sir.

12 **Q.**    Can you explain that to the Court?

13 **A.**    Yes.  Florida Drivers License was used to purchase the

14 Kel-Tec Sub 2000, received on 6/7 of 2018 in Washington State.

15         The Intratec 9mm Luger was purchased -- or, excuse

16 me, was received on 10/22/2018 in Washington, using the

17 Washington Drivers License.

18 **Q.**    And what is the email to the right-hand side?

19 **A.**    That is an email from Florida DMV depicting the Florida

20 Drivers License being counterfeit.

21 **Q.**    So they shared that information with you that they checked

22 and that it was a counterfeit license?

23 **A.**    Yes, sir.

24 **Q.**    What does slide number six represent?

25 **A.**    Number six is a note that was found on the Defendant's

1  Samsung S9.  It is in the notes section, and it has text on it.

2  **Q.**  Can you tell the Court what that note said?

3  **A.**  Yes.  "That being said, the satisfaction of it justifies

4  anything else.  I hate crikens normies and Karens so much, it

5  makes it worse to go through with it.  So here is my plan.  On

6  Christmas or black Friday, go to the mall food court with work

7  tunes (great base) a respirator (if tear gas is used) and a

8  weapon of choice.  I like the AB10.  It's concealable and comes

9  with a 30-rounder by default, though everyone chooses the AR

10  15.  I'm not saying it is normie, just over used."

11  **Q.**  With reference to a term like krankens, do you know what

12  is being referred to there?

13  **A.**  Yes.  It is an online gamer personality that we have

14  determined Alex, the Defendant, does not like, so based on

15  other statements that anybody he doesn't like, he refers to as

16  crikens.

17  **Q.**  That's a term he kind of adopted based on your assessment

18  of the materials that you've looked at?

19  **A.**  Yes, sir.

20  **Q.**  I'm showing you what is marked slide seven.  Can you tell

21  the Court what this slide is demonstrating about your

22  investigation?

23  **A.**  Yes.  On January 14th, these are footage that the

24  Defendant accessed and it is depicting the New Zealand mosque

25  shooting incident.

1  **Q.**  And can you tell the Court, what is the ChristChurch, New

2  Zealand mosque shooting?

3  **A.**  In March of 2019, an individual went into the mosque in

4  New Zealand and killed 51 people and injured 49.  He actually

5  went to a second mosque down the street, approximately 4-miles

6  away, and was shooting at that one as well.

7  **Q.**  Why was there a video-recording of this incident?

8  **A.**  The subject live-streamed it.

9  **Q.**  Okay.  And did that make this a very well-known mass

10  shooting event?

11  **A.**  It did.

12  **Q.**  I'm showing you slide number eight.  Can you explain to

13  the Court the information on this slide?

14  **A.**  Yes.  Downloaded on the Samsung S9, the search revealed

15  that there were numerous searches for the mass shooting that I

16  just spoke about in New Zealand, and we saw that there was a

17  search accessed on the Cura platform as to the New Zealand

18  massacre video.  Shortly thereafter, the video was downloaded

19  from the LiberalForum.org.

20  **Q.**  And so did he actually download the full video on

21  March 21st, 2020?

22  **A.**  Yes, sir.

23  **Q.**  And what does slide nine demonstrate?

24  **A.**  Slide nine are images from the video of the shooting.

25  **Q.**  And that full-length video and these images from that

1  video was found on his Samsung S9 mobile phone.

2  **A.**    The video was.  We took screen-shots of that.

3  **Q.**    I'm showing you slide number ten.  Can you explain to the

4  Court the information on this slide?

5  **A.**    Yes.  This is a Reddit post under AlextheBodacious, dated

6  February 18th of 2020, and it states, "How do I dox Sub Rosa.

7  I keep dying and being called pedo and want to kill people in

8  real life.  How can I find the addresses of those I hate and

9  execute them for their crimes?"

10  **Q.**    And here the reference to pedo, what did you determine

11  that to be?

12  **A.**    The term pedophile.

13  **Q.**    Do you have any evidence from your investigation, that

14  Mr. Treisman has tried to obtain information about people that

15  he dislikes online?

16  **A.**    We do.

17  **Q.**    Can you tell the Court about that?

18  **A.**    In one of the devices was kind of a dossier and it had the

19  name Ivory Soap, and in that, it had the identifiers of family

20  members of another individual.

21  **Q.**    And do you know why he was -- may have been searching for

22  the identity of this person known as Ivory Soap?

23  **A.**    I do not know.

24  **Q.**    Did you determine that that is a real person?

25  **A.**    We did, yes, sir.

1  **Q.**    And where did that person live or reside potentially?

2  **A.**    Yes, we did.

3  **Q.**    And where was that?

4  **A.**    Here currently in North Carolina, in the Fayetteville

5  area.

6  **Q.**    And can you explain to the Court what it means to dox

7  someone?  What is that slang for?

8  **A.**    To dox someone, is a term to post somebody's private

9  information publicly with malice intent to shame them or maybe

10  cause harm, and it usually involves posting the true name,

11  address, and information of the like.

12  **Q.**    I'm showing you slide number 11.  Can you explain to the

13  Court the significance of this information?

14  **A.**    Yes.  On February 22nd, 2020, a video was uploaded to

15  YouTube titled The Trial of Flippy's Mapper.  In this

16  screen-shot right here, specifically it is a screen-shot of a

17  Discord chat, and in it, in the text in the red, is what is

18  depicted to the right.  Where it says Thanos Car associated

19  with Treisman posted that text.

20  **Q.**    So let me break this down.  What exactly was posted on

21  YouTube?

22  **A.**    The Trials of Flipper Mapper.

23  **Q.**    And what is that?

24  **A.**    It is a video outing the Defendant as a pedophile.

25  **Q.**    Okay.  And so, basically, Mr. Treisman was added as a

1  pedophile on February 22nd, 2020?

2  **A.**    In that video, yes, sir.

3  **Q.**    Okay.  And then what is Discord?

4  **A.**    Discord is a free software application for instant

5  messaging and voiceover IP communications commonly used by

6  people that play video games.

7  **Q.**    And there was a user name Thanos Car that posted something

8  on Discord.

9  **A.**    Yes, sir.

10  **Q.**    And you determined that user name Thanos Car to be

11  associated with Mr. Treisman?

12  **A.**    Yes.  It was registered using the

13  AlextheBodacious@gmail.com.

14  **Q.**    And what did that account Thanos Car post?

15  **A.**    "How to rape kids and post CP.  Here we go.  Doesn't that

16  sicken you Flippy Mappers, greasy cock running against a nine

17  year old's defenseless vagina.  He thrust deep inside blowing

18  his load, getting her pregnant.  What will my parents say, a

19  child pregnant.  Hot."

20  **Q.**    So here in this example, you believe Mr. Treisman, posting

21  as Thanos Car, that he was going to rape kids and post CP.  Is

22  that right?

23  **A.**    Yes, sir.

24  **Q.**    And did you determine that Flippy Mapper is a reference to

25  Mr. Treisman himself?

1   **A.**   It is another online name that he uses.

2   **Q.**   I'm showing you slide number 12.  Can you explain what

3   this slide is about?

4   **A.**   This was an audio recording found on the Samsung S9, and

5   it is an audio and this is a rough transcript.  I know it is

6   hard to read of what is said in that video.

7   **Q.**   And is that video -- what device was that obtained from?

8   **A.**   The Samsung S9.

9   **Q.**   And is that recording on Government's Exhibit No. 2?

10  **A.**   Yes, it is.

11  **Q.**   Is it the file that is labeled Porn.M4A?

12  **A.**   Yes, it is.

13          **MR. PRINCIPE:**  Your Honor, permission to publish

14  that.

15          **THE COURT:**  All right.

16          (Audio recording was played.)

17  **BY MR. PRINCIPE:**

18  **Q.**   I'm showing you slide 13.  Can you tell the Court the

19  significance of this slide?

20  **A.**   Yes.  On April 8th, a comment was posted on iFunny, which

21  it reads, "I was going to do a Columbine for a while.  I think

22  it would be better put towards something more memorable," under

23  the name of AlextheBodacious.

24  **Q.**   Was there some exchange about what type of thing might be

25  more memorable than doing a mass shooting to Mr. Treisman?

1  **A.**    No, sir.  Not that I'm aware.

2  **Q.**    In another context, was there a statement made with regard

3  to the 2022 presidential election?

4  **A.**    There was.

5  **Q.**    And doing something more memorable?

6  **A.**    In that same chat, the Alexthebodacious states that he has

7  to, Save Bernie, which we took to be Bernie Sanders.

8  **Q.**    Why did you take that to be Bernie Sanders?  Was there

9  something about the timing of that comment that made you

10  believe it was in reference to Bernie Sanders?

11  **A.**    On April 8th, which is when this was taken, is the same

12  date that Bernie Sanders dropped out of the presidential race.

13  **Q.**    So commenting about saving Bernie had to do -- or

14  coincided with the date that Bernie Sanders dropped out of the

15  presidential race?

16  **A.**    That's what we believed it to be, yes.

17  **Q.**    I'm showing you slide 15.  Can you explain to the Court

18  the significance of that?

19  **A.**    This is another iFunny comment or post, and it is, "Should

20  I kill Joe Biden?"

21  **Q.**    And what account was that posted by?

22  **A.**    AlextheBodacious.

23  **Q.**    And what date?

24  **A.**    4/15 of this year, 2020.

25  **Q.**    I'm showing you slide 16.  Can you explain to the Court

1 the significance of that content and how it relates to your

2 investigation?

3 **A.**   Yes.  As a result of searching the devices, we saw

4 numerous searches for, Where is Joe Biden, where is Joe Biden

5 today.  Joe Biden's house.  DNC.  Numerous searches for state

6 gun laws, silencers and, again, Joe Biden's house over several

7 months.

8 **Q.**   Okay.  Can you go through the list and tell the Court

9 exactly what you found?

10 **A.**   Absolutely.  On 3/10 is a search for, Where is Joe Biden.

11          On 4/6 of this year, it was, Where is Joe Biden

12 today.

13          On 4/15, it was previously mentioned iFunny meme,

14 "Should I kill Joe Biden?"

15          4/17, searched Joe Biden's house.

16          427, searched DNC.

17          4/29, searched state-by-state gun laws and background

18 checks required for private sales.

19          5/2, purchased -- this was not a search, this was

20 what we know, that an AR 15 type weapon was purchased in New

21 Hampshire.

22 **Q.**   By Mr. Treisman?

23 **A.**   By Mr. Treisman, yes.

24 **Q.**   Okay.

25 **A.**   On 5/3, a credit card purchases places the Defendant at a

1  Wendy's, 4-miles away from Joe Biden's house in Wilmington,

2  Delaware.

3          Search was peaceable journey laws, governing

4  transport of firearms over state lines.

5          On 5/5 was various rifle parts.

6          On 5/8 was silenter code.

7          On 5/13, searched numerous night vision goggle types

8  and PPE, personal protection equipment.

9          And 5/13 as well, searched Joe Biden's house.

10         On 5/14, Joe Biden's house, where is Joe Biden, 1209

11  Barley Mill Road, which is Joe Biden's residence in Wilmington,

12  Delaware.

13         On 5/16, was a screen-shot we found off the Lenovo

14  laptop.

15         And 5/19, searched Joe Biden.

16  **Q.**   And earlier it was mentioned that there was a search

17  warrant for cell location data for the Samsung S9 telephone.

18  **A.**   Yes.

19  **Q.**   Are you familiar with that data, generally speaking?

20  **A.**   Generally, yes.

21  **Q.**   Does it corroborate that he did go up to Delaware or the

22  phone was in Delaware at some point around the time that the

23  credit card transaction took place at the Wendy's?

24  **A.**   Yes, sir.

25  **Q.**   Showing you slide 17.  Can you explain the significance of

1  this slide?

2  **A.**   Slide 17 is the screen-shot taken from the Lenovo laptop.

3  In the bottom right-hand corner, it is dated 5/16 of this year.

4         The screen-shot reads, "Fridge, field.  Go out and

5  see things you wouldn't see from Google maps.  What kind of

6  gate is there?  How many cameras are in the drive?  Routes.

7  Instances.  Think of every scenario.  The letter D.  Get

8  everything set up.  Execute."

9  **Q.**   And this note corresponds with a lot of activity related

10 to the searches about Joe Biden, correct?

11 **A.**   We believe it does, because it falls on 5/16, and there

12 was still additional searches in or around that time.

13 **Q.**   Can you explain to the Court the significance of the

14 content on slide 18?

15 **A.**   A video was found on the Samsung S9.  It is a video of

16 Mandalay Bay, and the audio is a depiction of the Defendant

17 screaming other things as well as Allah Akhar at the end.

18 **Q.**   Was there a significant mass shooting event that occurred

19 at that casino in Las Vegas?

20 **A.**   It was the Route 91 Harvest Music Festival.

21 **Q.**   Can you tell the Court a little bit more about that event?

22 **A.**   During that festival in 2017, an individual opened fire on

23 the attendees of that festival, killing 58 on scene and then

24 some time later another person died, taking the total to 59,

25 and injuring over 500 people.

**Q.**   Okay.  And during the course of your investigation and
interviews, did you determine that this event had significance
to Mr. Treisman?

**A.**   Yes.

**Q.**   What did -- how did you determine that?

**A.**   The interview with Shawn Adams, he opined that this was
Alex's favorite mass shooting, based on the total number of
casualties.

**Q.**   Okay.  And is the recording that you recovered from that
device on Government's Exhibit 2?

**A.**   It is.

        **MR. PRINCIPE:**  Your Honor, may I have permission to
publish that?

        **THE COURT:**  You may.

        (Video was played.)

**BY MR. PRINCIPE:**

**Q.**   Slide 19 basically has the same words as was spoken on
that video?

**A.**   Yes, sir.

**Q.**   Can you tell the Court about the significance of slide 20?

**A.**   Slide 20, this was a video taken off the Samsung S9.  It
is a video and audio recording, rather, depicting the O'Hare
Airport, a plane, and there is words to go with the video.

**Q.**   Okay.  Is that video also on Government's Exhibit No. 2?

**A.**   It is.

1          **MR. PRINCIPE:**  Your Honor, permission to publish

2    that.

3          **THE COURT:**  You may.

4          (Video was played.)

5    **BY MR. PRINCIPE:**

6    **Q.**   In slide 24 this has the text of what was spoken on that

7    video.  Correct?

8    **A.**   Yes, sir.

9    **Q.**   I'm showing you slide 22.  Can you explain to the Court

10   the significance of this information on this slide?

11   **A.**   Yes.  Range 56 is a shooting range just outside Fort

12   Bragg, still on Fort Bragg property.  The Defendant, along with

13   Shawn Adams, went there and they shot rifles, handguns.

14         The first image is a picture of who we believe to be

15   Shawn Adams shooting a gun.

16         The second image is the Defendant, again, at Range 56

17   on a different date, which we know to be May 10th.

18         The third image is a sign that is posted at the

19   entrance of Range 56.

20         Fourth image is the standard sign around the military

21   base, telling people what you cannot bring on to the property.

22   **Q.**   What are you not allowed to bring?

23   **A.**   Drones, weapons.

24   **Q.**   Did you inquire into the different ways of getting to that

25   range?  Would you have to pass by this sign in order to get to

1  the range?

2  **A.**   Yes, you would.

3  **Q.**   Did you explain -- there was prior testimony about what

4  Shawn Adams described Mr. Treisman doing while firing guns at

5  that range.

6  **A.**   Yes.  He was screaming the name of mass shooters while

7  pulling the trigger.

8  **Q.**   During the course of your investigation, did you find that

9  there was another individual at Fort Bragg that Mr. Treisman

10  was communicating with?

11  **A.**   Yes, sir.

12  **Q.**   Can you explain to the Court a little bit about that

13  information?

14  **A.**   Yes.  That is a soldier stationed at Fort Bragg currently,

15  who has had online communication and text communication with

16  the Defendant.

17  **Q.**   And why was that significant during the course of your

18  investigation?

19  **A.**   The Defendant texted the individual, Joe white, telling

20  him that he is coming out east at a later date.  The Defendant

21  texted Joe White saying, "I'm outside, outside the base," which

22  caught him off-guard, because he didn't know that the Defendant

23  was coming to meet him.

24  **Q.**   Was Joe White interviewed during the course of your

25  investigation?

**A.**    He was.

**Q.**    Is Joe White his actual name?

**A.**    Yes.

**Q.**    Did Mr. White ever meet up with Treisman; to your

knowledge?

**A.**    Say that one more time.  Sorry.

**Q.**    Did Mr. White ever meet up with Mr. Treisman in

Fayetteville during Mr. Treisman's time in Fayetteville, to

your knowledge.

**A.**    No, sir, he did not.

**Q.**    Did Mr. Treisman try to get him to go to the range with

him?

**A.**    He did.

**Q.**    Did Mr. Treisman ask him to bring anything with him?

**A.**    In the text message between the two, the Defendant and Joe

White, where they stated that they were going to go shooting,

the Defendant sends a text to Joe White saying, "Whatever you

can smuggle off the base."

**Q.**    Did you interpret that to mean whatever firearms he might

be able to smuggle?

**A.**    Firearms or anything that he could reasonably get off the

base.

**Q.**    I'm showing you slide 23.  Can you explain to the Court

the significance of this slide is?

**A.**    This was an image that was sent to Shawn Adams by the

1   Defendant on July 9th of 2019, with the caption of "Running

2   won't do much good."

3   **Q.**   I'm sorry, who sent that to whom?

4   **A.**   The Defendant sent that to Shawn Adams on July 9th of

5   2019.

6   **Q.**   Did you do any research into this image?

7   **A.**   I did.

8   **Q.**   What did you determine?

9   **A.**   This is a stock image that I was able to observe on

10  Google.  It was the third image that popped up without the

11  animation drawing in the back with the gentleman holding the

12  weapon saying, "Running won't do you much good."

13  **Q.**   What did that suggest to you?

14  **A.**   That it had been created.

15  **Q.**   By Mr. Treisman?

16  **A.**   By the Defendant, yes.

17  **Q.**   Can you explain to the Court the significance of slide 24?

18  **A.**   Found on the Seagate Pipeline 500 gig hard drive was a

19  document entitled A Guide To Mass Shooting.  In the hours that

20  we see leading up to the creation of that document, as far as

21  it is timestamped, there were searches and downloads for the

22  font and the software used, the Apache Office One,

23  approximately two hours before.

24  **Q.**   Okay.  And what was the significance of that information

25  in your assessment?

1  **A.**    That he was downloading it to author the document or
2  likely author the document.
3  **Q.**    Did you search for anything online that may resemble the
4  document that you found?
5  **A.**    We searched and we have not been able to apparently locate
6  anything.
7  **Q.**    And what did that suggest to you?
8  **A.**    That it was likely authored by the Defendant.
9  **Q.**    I'm showing you slide 25.  Can you explain what that
10 represents?
11 **A.**    Yes.  That was the first page, if you will, of the very
12 beginning of the document titled, The Guide To Mass Shooting.
13 **Q.**    And it shows the contents of that document.
14 **A.**    Breakdown by chapters, I guess, yes.
15 **Q.**    Can you tell the Court what the chapters say and what the
16 headings were?
17 **A.**    Chapter one is labeled as reasonings.  Under that it has
18 motivations, materials.
19         Chapter two is preparation.  Under that it has goals,
20 supplies, and maps, training and gear.
21         Chapter three says, showdown, and underneath that it
22 says, "show em and pro tips."
23 **Q.**    Tell the Court about the significance of the contents on
24 slide 26.
25 **A.**    This was found under, as you see, chapter one with a

1  couple references that are highlighted.

2  **Q.** Okay. Can you explain the significance of those

3  references and the content?

4  **A.** Yes. At the top under chapter one, reasonings, is a

5  quote, "No one is born a killer. Society just shapes them that

6  way, Arthur Fleck."

7       At the bottom of that on the same side, Arthur Fleck

8  is the main character in the movie The Joker, which came out in

9  2019. That is about a man who becomes a mass killer and blames

10 society for alienation as the cause.

11 **Q.** Okay. And what is the significance of highlighting on

12 this right-hand side of that slide?

13 **A.** On the right-hand side is the word krankens, which is the

14 same word that we have seen used in other writings by the

15 Defendant.

16 **Q.** What did that indicate to you?

17 **A.** That it was likely authored by the Defendant.

18 **Q.** I'm showing you slide 27. Can you tell the Court the

19 significance of this slide?

20 **A.** This is again still part of the same Guide To Mass

21 Shooting. The highlighted portion, if you are reading this and

22 have no interest in shooting but want to understand and stop

23 them, then you must know the core issue is society itself. We

24 also have highlighted, "just like in," and it goes to the next

25 line.

1          The language indicates that this was meant to be

2    after the fact, that somebody would discover it.

3    **Q.**    And what did that indicate to you that the purpose of this

4    document was to be?

5    **A.**    Some type of manifesto.

6    **Q.**    For Mr. Treisman?

7    **A.**    We believe so, yes.

8    **Q.**    And what is the significance of not the yellow box with

9    the word, but the box above that?

10   **A.**    I'm sorry, I'm --

11   **Q.**    Well, there is a box in light yellow towards the bottom of

12   that slide.  What is that information?

13   **A.**    That is the information from the computer where it shows

14   the date it was created.

15   **Q.**    Does it have a creator?

16   **A.**    Yes.

17   **Q.**    What does that say?

18   **A.**    Alex T.

19   **Q.**    What was the date of creation?

20   **A.**    1/1 of this year.

21   **Q.**    And that was metadata from the file found on

22   Mr. Treisman's device?

23   **A.**    Yes, sir.

24   **Q.**    I'm showing you slide 29.  Can you tell the Court the

25   significance of that slide?

1    **A.**   Yes.  While in custody at the Cabarrus County Jail, jail

2    staff did a search of his cell and during that they found

3    several documents, these two in particular.

4    **Q.**   Did you inquire with the jail in terms of their regular

5    policies and procedures for conducting searches of inmate

6    cells?

7    **A.**   I did.

8    **Q.**   Can you tell the Court a little bit about what you found

9    out about that?

10   **A.**   Yes.  I spoke to one of the sergeants, and they informed

11   me that this is a routine thing that the jail does.  They break

12   it up by pods, and it is done so by the end of the month they

13   have searched every inch of the jail.

14   **Q.**   What is the significance of information that was found in

15   Mr. Treisman's jail cell?

16   **A.**   On the image specifically to the left, it depicts somebody

17   hitting somebody else with a bat.  There is an arrow that

18   points saying, Me, to the subject or the individual with the

19   bat, which has nails or what appears to be nails in it.  So the

20   right side of that image is a dog with the name Sasha pointed

21   to it.

22   **Q.**   What is significant about that?

23   **A.**   We know the Defendant has a dog named Sasha.

24   **Q.**   How do you know that?

25   **A.**   That dog was in the Honda the day that the Defendant was

1  arrested.

2  **Q.**   And what is the text above that?

3  **A.**   "Whoever the fuck calls the cops on a parked car."

4  **Q.**   What did you interpret that to be in reference to?

5  **A.**   The bank staff that called the police.

6  **Q.**   So essentially, a drawing of Mr. Treisman attacking the

7  bank teller or whoever from the bank called the cops on him

8  because of the van?

9  **A.**   Yes, sir.  That's what we believe.

10 **Q.**   What does it say on the left-hand side of that envelope?

11 **A.**   The far left?

12 **Q.**   Yes.

13 **A.**   Tannerite being used.

14 **Q.**   Okay.

15      Slide 30, can you tell the Court what that is an

16 image of.

17 **A.**   Yes.  That is, again, from the search of the cell.  It is

18 a blown-up version of one part of the document.  On the

19 left-hand side, it has an individual, what appears to be

20 striking somebody with a bat, again, with a nail through the

21 bat with the word "Me," and an arrow pointing to it.

22      To the right, again, is the depiction of a dog with

23 the word Sasha and an arrow pointing towards it.  The person

24 with the bat is saying, "Whoever the fuck calls the cops on a

25 car in the parking lot."

**Q.**    Okay.

**A.**    What is on the right-hand side or bottom corner of that
page there is what appears to be somebody behind a rifle with
the arrow saying, "Not me," and to the right of that is a
circular similar to a scope on a rifle with crosshairs, and a
person in those crosshairs with an arrow stating, "State
prosecutor."

**Q.**    Does Mr. Treisman have pending state charges related to
pornography charges?

**A.**    Yes, sir, he does.

**Q.**    Those are currently pending in North Carolina?

**A.**    Yes, sir.

**Q.**    Going back to slide 29 for a second, above the image we
just looked at in the mid to lower part of the right-hand side
of that page, was there a telephone number listed there?

**A.**    There was.

**Q.**    Did you determine whose telephone number that is?

**A.**    It was an inmate at the jail.

**Q.**    Is that inmate still in custody?

**A.**    To our knowledge, no, sir.

**Q.**    Who did you determine that inmate to be?

**A.**    It was an inmate with the last name of Klutz.

**Q.**    I'm showing you slide 31.  Can you tell the Court what
this information is?

**A.**    A search again was done of the Defendant's cell and

1  numerous documents were taken out and in that, what they said

2  was an autobiography.  This is just an excerpt from that.  I

3  had -- would you like me to read it?

4  Q.  Yes.

5  A.  "I had decided instead of doing a mass shooting, I would

6  move," and I cannot read that last word of that sentence.

7  Q.  Okay.

8          I'm showing you slide 32.  Can you tell the Court

9  what the significance of this information is?

10 A.  Yes.  Found on the hard -- on one of the hard drives, was

11 the image on the left of what appears to be a Polish passport,

12 and then the image on the right is the stock photo that we were

13 able to take from Open Source.

14 Q.  So you were able to find the image on the right through an

15 internet search?

16 A.  Correct.  Yes, sir.

17 Q.  And then you found the same apparent image that had been

18 modified on one of Mr. Treisman's devices?

19 A.  Yes, sir.

20 Q.  Can you tell the Court what were the changes that were

21 apparent on the image found on Mr. Treisman's device?

22 A.  The three facial photos that appear on the document are

23 different, as well as the date of birth.  The date of birth on

24 the passport with the Defendant's face, is March 29th, 1993.

25 Q.  And what does that date of birth match?

1  **A.**   It does not match the other date of birth that was on the

2  Florida Drivers License.

3  **Q.**   Okay.  And those were photos that changes were to include

4  photos of his face.  Is that right?

5  **A.**   Yes.

6  **Q.**   I'm showing you slide 33.  What is the significance of

7  that?

8  **A.**   This is the Defendant's U.S. passport.

9  **Q.**   Where was that located?

10  **A.**   His apartment in Long Beach, California.

11  **Q.**   Was that seized as part of your investigation?

12  **A.**   Yes, sir, it was.

13  **Q.**   Did you determine that that is a validly issued passport

14  for Mr. Treisman?

15  **A.**   Yes, sir, we did.

16  **Q.**   What else did you find when you seized that passport?

17  **A.**   That this was a duplicate.  It was a replacement for a

18  lost passport.

19  **Q.**   Do you know the whereabouts of that lost passport?

20  **A.**   We do not.

21  **Q.**   It was just reported lost?

22  **A.**   That's correct.

23  **Q.**   And did you find out anything about the -- how many

24  passports has Mr. Treisman ever been issued by the U.S.

25  Government?

1   **A.**   Four.

2   **Q.**   Do you know the whereabouts of the passport that he had

3   prior to getting this replacement?

4   **A.**   We do not.

5   **Q.**   Do you know what the expiration date would have been for

6   that prior passport?

7   **A.**   Yes, sir, we do.  It would have been March 16th of 2021.

8   **Q.**   So that expiration date would be in the future from

9   today's date.  Correct?

10  **A.**   Yes, sir.

11  **Q.**   And we don't know where the whereabouts of that document

12  is.

13  **A.**   No, we do not.

14  **Q.**   I'm showing you slide 34.  Can you tell me the

15  significance of this?

16  **A.**   Yes, sir.  This is a snippet of the transcription of a

17  jail call that the Defendant had with his mother, Kimberly

18  Treisman, and it has highlighted text on there.

19  **Q.**   Is that recording on Government's Exhibit No. 2?

20  **A.**   Yes, sir.

21          **MR. PRINCIPE:**  Your Honor, permission to publish a

22  short excerpt of that recording.

23          **THE COURT:**  You may.

24          (Audio was played.)

25          **MR. PRINCIPE:**  Your Honor, I'm going to move it to

1  the six minutes and 30 second mark.

2          **THE COURT:**  All right.

3          **MR. PRINCIPE:**  6:27 mark, Your Honor.

4          I have to move it earlier, Your Honor, to about six

5  minutes.

6          (Audio was played.)

7  **BY MR. PRINCIPE:**

8  **Q.**  I'm stopping that at 6:53 seconds.  There was reference by

9  the female speaking in terms of jumping bail.

10 **A.**  Yes, sir.

11 **Q.**  Did you determine who the female on the recording was?

12 **A.**  Yes, we did.  The Defendant's mother, Kimberly Treisman.

13 **Q.**  Has she applied for third-party -- do you know who the

14 third-party custodian was being proffered for Mr. Treisman?

15 **A.**  I do not.

16 **Q.**  I'm showing you slide 35.  Can you explain to the Court

17 the significance of this information?

18 **A.**  Yes.  This was -- it is a screen capture from the Samsung

19 S9 with the account of AlextheBodacious@gmail.com.  It is from

20 Alexthebodacious@gmail.com, and it is very small on my paper,

21 but it appears to be addressed to info@langlais.com.  An Open

22 Source search revealed that was a Canadian immigration law

23 firm.

24 **Q.**  What was the content of the email in reference to?

25 **A.**  It reads as, "About a month ago I asked Jocelyn Cane for

1  information as to how one acquires nationality.  I was born in

2  Seattle, Washington, U.S.  But my parents never filed a birth

3  certificate for me.  They planned to move to Canada and I was

4  around six, we moved to Montreal, though without a birth

5  certificate, I never had a passport or any form of ID.  I have

6  lived here my whole adult life, but still have no citizenship."

7  **Q.**   Is the information represented in that email consistent

8  with Mr. Treisman?  Is there any inaccuracies in that

9  information as far as your investigation has revealed?

10 **A.**   Yes, sir.

11 **Q.**   Can you explain that to the Court?

12 **A.**   We know that the Defendant was born not in Seattle,

13 Washington, but Santa Fe, New Mexico.  And to our knowledge,

14 the parents have never lived in Canada.  His mother currently

15 resides in Illinois.

16 **Q.**   And what about his father, is he deceased?

17 **A.**   His father is deceased, yes.

18 **Q.**   I'm showing you slide 36.  Can you explain to the Court

19 the significance of these two images?

20 **A.**   Yes.  In the van, the white van, these documents were

21 found.  It is a lease for an apartment in Canada.

22 **Q.**   Okay.  And what was the name on the lease documents and

23 the power bill?

24 **A.**   Alex Theiss.

25 **Q.**   And that's the alias for Mr. Treisman?

**A.**  Yes, sir, it is.

**Q.**  So was this valid lease documents as far as you know?

**A.**  As far as we know, yes.

**Q.**  What was the time frame that he had a lease for an apartment in Montreal, Canada?

**A.**  If I remember correctly, it was December of 2017 to November of 2018, and the image to the right is the corresponding power bill from one of those months.

**Q.**  And Mr. Treisman is 19, going on 20 now in 2020.  Correct?

**A.**  Yes, sir.

**Q.**  So this would have been several years earlier when he would have been 16 or 17?

**A.**  Yes, sir.

**Q.**  Did your investigation reveal the identity of who Gunter was?

**A.**  Yes, it did.

**Q.**  Who was Gunter?

**A.**  Shawn Adams.

**Q.**  Did your investigation reveal any information with regards to why Shawn Adams continued to interact with Mr. Treisman, even after having reservations about his character when they spent time together in Los Angeles?

**A.**  Shawn Adams was put off by the Defendant, but was still wanting to keep in touch with him, and Alex, the Defendant -- excuse me, was paying for trips for Shawn.

1 **Q.** Was Mr. Treisman also providing him money sometimes as

2 needed?

3 **A.** Yes, sir.

4 **MR. PRINCIPE:** Your Honor, I have no additional

5 questions for this witness.

6 **THE COURT:** Let me ask one question before your

7 cross-examination. I believe you testified about the items

8 that were found in the van. I think you mentioned a large sum

9 of money.

10 **THE WITNESS:** Yes, sir.

11 **THE COURT:** I guess somebody counted the money. Do

12 you know how much money there was?

13 **THE WITNESS:** I was told by KPD, Kannapolis Police

14 Department, that it was roughly $509,000.

15 **MR. RANDALL:** I do have one follow-up question.

16 **BY MR. PRINCIPE:**

17 **Q.** Do you know what originally happened with that money?

18 **A.** The police department seized -- held it for some time, and

19 then I know it was turned over to his attorney.

20 **Q.** Okay. Thank you.

21 **THE COURT:** Cross-examination.

22 **MR. RANDALL:** Thank you.

23 **CROSS-EXAMINATION**

24 **BY MR. RANDALL:**

25 **Q.** And that was lawfully acquired funds that Alex had.

**A.**   Yes, sir.

**Q.**   Okay.  He had gone to the bank, I guess in California, and withdrawn 500,000 and some dollars in cash.

**A.**   Yes, sir.

**Q.**   Okay.  I think in the van they found a receipt for that withdrawal.

**A.**   Yes, sir.  I believe they did.

**Q.**   Did anybody ask him why he withdrew half a million dollars in cash?

**A.**   Not that I recall at this time, no, sir.

**Q.**   Okay.  He had some other strange things in the van, didn't he?  He had a bag of white powder.  Do you recall seeing that?

**A.**   No, sir, I don't.

**Q.**   Did you review the short form inventory from the Kannapolis folks when they searched the van?

**A.**   I did.  It has been some time.

**Q.**   Were you there when they searched the van?

**A.**   I was not.

**Q.**   Are you aware of any of the officers that searched the van, whether or not they had body-cams?

**A.**   I do not know.

**Q.**   Okay.  But you haven't reviewed anything like that.

**A.**   In regards to the van?

**Q.**   Correct.  The initial search of the van.

**A.**   Could you clarify that question, please?

**Q.** Sure. Are you aware of any existence of any body-camera
video of any of the officers that initially searched the van?

**A.** No, sir, I'm not.

**Q.** How old is Mr. Adams?

**A.** I do not know his current age or date of birth.

**Q.** Okay. Did you personally interview him or was that
somebody from your field office?

**A.** That was somebody from the FBI field office.

**Q.** And so Shawn Adams, I guess his gamer name is Gunter?

**A.** Yes, sir. It is also Gunter the penguin, shortened
sometimes for Gunter.

**Q.** Gunter the penguin. And what online game or games does he
use that call sign, I guess?

**A.** The only one that I'm aware that he played was Sub Rosa.

**Q.** Are you familiar with this Sub Rosa game?

**A.** No, sir.

**Q.** Have you done any investigation into what it is?

**A.** Outside of a first person shooter game, no, sir, I have
not.

**Q.** Have you gone to a website to view and see what the game
is?

**A.** No, sir, I have not.

**Q.** Would it surprise you if it was described as a game kind
of between Call of Duty and Mine Craft?

**A.** I'm actually not aware. I'm unaware of what Mine Craft

1  is.  I know what Call of Duty is.

2  **Q.**    Not a problem.  Not a problem.

3            The slide, I guess in your presentation that is

4  number 32 entitled Fake Passport, those are --

5  **A.**    Yes, sir.

6  **Q.**    Where was this located?

7  **A.**    The one with the Defendant's photo on it?

8  **Q.**    Right.

9  **A.**    I do not recall which hard drive.  It was just on one of

10 the hard drives.

11 **Q.**    Do you know when it was created?

12 **A.**    I do not.

13 **Q.**    The slide number 22, the gun range, is that open to the

14 public?

15 **A.**    To my understanding, no.

16 **Q.**    Okay.  Have you spoken with anybody from Fort Bragg?

17 **A.**    We have spoken to one of the Army CID officers, but he

18 does not control the range.

19 **Q.**    Has anybody tried to determine whether or not it is open

20 to the public?

21 **A.**    No, sir.  I have not personally done that.

22 **Q.**    You said the first picture on there that is Gunter or

23 Shawn?

24 **A.**    Shawn Adams.  That's who we believe it is, yes, sir.

25 **Q.**    Was he shown that picture to see if that's him, or are you

1  guys just assuming that is him?

2  **A.**    It was an image taken off the phone, so that's why we

3  believe it to be Shawn Adams.

4  **Q.**    So the drivers license, the Florida License and the

5  Washington State License, they are both fake IDs?

6  **A.**    Apparently.  I confirmed the Florida Drivers License, and

7  a search through FBI -- I'm not sure which division that is,

8  but Washington State ran that and they were not able to find

9  anything on file.

10  **Q.**    Okay.  And the name or the last name is different and the

11  birth date makes him over 21.

12  **A.**    For which ID?

13  **Q.**    I think for both.  Right.  They both make him older than

14  21?

15  **A.**    From today's date, yeah.

16  **Q.**    I mean, if that was his birthday, he presented that like

17  at a bar, they would say, you are over 21, you can come on in

18  and have a cocktail.

19  **A.**    Yes, sir.

20  **Q.**    Has anyone that you know of spoken with Alex's mother?

21  **A.**    Yes, sir.

22  **Q.**    When did they do that?

23  **A.**    It would have been the night on the 28th, the date of his

24  arrest, I believe.

25  **Q.**    Okay.  And during that conversation, did she let anyone

1  know that Alex had been diagnosed with Asperger's, otherwise

2  known as ASD?

3  **A.**   Without seeing the report, I can't recall exactly.  I know

4  she had mentioned at one time that she believed there was some

5  type of Asperger's.

6  **Q.**   So has any one made you aware that when he was 12 years

7  old, he was diagnosed with Asperger's?

8  **A.**   No, sir.

9  **Q.**   You never seen that report?

10 **A.**   No, sir.

11 **Q.**   Are you familiar with Asperger's?

12 **A.**   No, sir, I am not.

13 **Q.**   Are you familiar with any type of mental health

14 deficiencies?

15 **A.**   No, sir.

16 **Q.**   Under the Joint Terrorism Task Force, do you all have a

17 terrorist profiler psychologist that you see on TV?

18 **A.**   The FBI has the behavior analysis unit.

19 **Q.**   There you go.  Were they involved in this case?

20 **A.**   Yes, they were.

21 **Q.**   Was anybody on that part of the investigation made aware

22 that Alex has Asperger's?

23 **A.**   To the extent that the mother had claimed it but we didn't

24 have any documentation, that's the only thing we've been able

25 to relay.

**Q.**   Has anybody tried to get any documentation related to his
Asperger's Disease?

**A.**   No, sir.  Not that I'm aware of.

**Q.**   Do you think that might be an important thing in your
analysis of him?

**A.**   No, sir, because I don't make those analyses like that.

**Q.**   Okay.  So if he had high functioning Autism Spectrum
Disorder -- well, strike that.

So we talked about the iFunny memes or whatever.
What is a meme?  I think it is slide number 15.

**A.**   I do not know the definition of what an actual meme is.

**Q.**   Did you look at this iFunny account with the
AlextheBodacious?

**A.**   Yes, sir, we did.

**Q.**   Okay.  Do you know how many posts he had?

**A.**   It was several posts.

**Q.**   He had like 7,500.  Would that be about right?

**A.**   Without knowing the true -- I don't know the true number.
I know it was several.  It was several.

**Q.**   The Flippy Mapper YouTube Channel, have you looked at
that?

**A.**   Yes.  I have, yes, sir.

**Q.**   Have you actually watched any of the videos?

**A.**   Yes, sir, I have.

**Q.**   Do you agree with me that he is talking about playing

1  video games and kind of talking smack?

2  **A.**    Yes, sir.  On some of the videos, yes, sir, they are.

3  **Q.**    Okay.  And does he kind of give a guide to people on how

4  to play the game in some of the videos?

5  **A.**    Yes, sir.  Some of the videos, he does.

6  **Q.**    Okay.  I want to say that on one of your slides -- well,

7  what is slide 14?  I couldn't see it in the little printout.

8  **A.**    Sorry about that.

9  **Q.**    That's okay.

10  **A.**    It is an exchange on Telegram from an individual to the

11  Defendant, and the blue writing, the last thing says "You're

12  iFunny." In the green text it says -- the response is

13  AlextheBodacious.

14  **Q.**    So that just identified Alex, as AlextheBodacious.  What

15  is significance of that?

16  **A.**    It shows the, I guess, the relation of somebody asking

17  what his iFunny name or account name is with response of

18  AlextheBodacious.

19  **Q.**    Okay.  So then on what is that, slide 13, you talk about a

20  comment made April the 8th.  Is that this year, last year?

21  **A.**    It was this year.

22  **Q.**    Okay.  Did that pop up on any type of Joint Terrorism Task

23  Force computer alert like, oh, my, God somebody is talking

24  about doing Columbine shootings or anything?

25  **A.**    No, sir, not that I'm aware.

**Q.**   I only ask, you know, you see this stuff on TV.  Prior to
May the 28th, did you guys even know who Alex was?

**A.**   Personally, I did not know who Alex was before May 28th.

**Q.**   Okay.  During the investigation, was there any reports or
anything that came up, watch list about Alex?

**A.**   Regarding --

**Q.**   Being this mass shooter terrorist wanting to be a Canadian
citizen.

**A.**   No, sir.  Not that I'm aware of.

**Q.**   Okay.  Has anyone determined whether or not Alex lived in
Canada?

**A.**   The best we've been able to determine is just what was on
that lease and the corresponding power bill.

**Q.**   Okay.  And then where would he have moved from there, to
Washington State?

**A.**   I do not know, sir.

**Q.**   Okay.  During your investigation, have you all been able
to determine where it is that he's lived?

**A.**   He's lived in several locations that we know.  One of them
being in Seattle; Seattle, Washington.  Another one in Long
Beach.  And then some hotels, as best we can tell from
receipts.

**Q.**   Okay.  So Washington State was before Long Beach?

**A.**   Yes, sir.

**Q.**   And then in Long Beach, that's where he withdrew the

1  money, right, California?

2  **A.**    Yes, it was.

3  **Q.**    Okay.  And he hit the open road in his van?

4  **A.**    Sorry.

5  **Q.**    Then he kind of hit the open road in the van.

6  **A.**    Yes, sir.  Best we can tell.

7  **Q.**    The best your investigation has been able to determine.

8  **A.**    Yes, sir.

9  **Q.**    He's gone to a bunch of different states.

10  **A.**    Yes, sir.

11  **Q.**    Ride around with his dog Sasha.

12  **A.**    Yes, sir.

13  **Q.**    Picking up guns here and there in different states.

14  **A.**    Yes, sir.

15  **Q.**    With over $500,000 in cash.

16  **A.**    Yes, sir.

17  **Q.**    Okay.  And this is the only arrest that he's had, was in

18  Kannapolis.

19  **A.**    To my knowledge, yes, sir.

20  **Q.**    To the best of your knowledge, he hasn't committed any

21  acts of violence.

22  **A.**    Not that I am aware of at this time, no, sir.

23  **Q.**    It seems as though he likes guns.

24  **A.**    I believe so.

25  **Q.**    Isn't one of his Flippy Mapper videos actually him

1 shooting firearms with somebody?

2 **A.**   There was one, yes, sir.

3 **Q.**   Kind of like going across the country, here is what is

4 going on, stopping off and shooting guns with whoever, I forget

5 the person's name.

6 **A.**   There was a video, yes, sir.

7          **MR. RANDALL:**  If I can have just a moment, Your

8 Honor.

9          **THE COURT:**  All right.

10 **BY MR. RANDALL:**

11 **Q.**   Mr. White from Fort Bragg, he is like a private or

12 something.

13 **A.**   I was never in the military, so I believe he is a private.

14 **Q.**   An enlisted person.  Did he indicate how he had met Alex?

15 **A.**   I don't have the report in front of me.  I want to say

16 they met online playing the games.

17 **Q.**   Playing the games.  Okay.

18          Did Mr. White have any opinion as to Alex?  Shawn

19 thought I'll kinds of things about Alex.  Did Mr. White make

20 any opinions?

21 **A.**   He did, yes, sir.

22 **Q.**   What were his opinions?

23 **A.**   During our interview of Mr. White, he stated that the

24 encounter of the Defendant showing up unannounced, basically

25 trying to get him off the base, Mr. White said he thought that

1   Alex was coming to kill him.

2   **Q.**   Okay.

3           Did he report that to anybody prior to you all going

4   out to interview him?

5   **A.**   No, sir.  Not that I am aware of.

6   **Q.**   During the investigation, did he send any online chats

7   between Mr. White and Alex?

8   **A.**   I know there has been text messages.  As far as online

9   chats, I do not recall any at this time.

10  **Q.**   Okay.  Are you aware if Alex has any other friends other

11  than these people he's met online?

12  **A.**   I do not know.

13  **Q.**   And you said he had a book on Islam.  What was the book on

14  Islam that was in his car that caused the Kannapolis Police to

15  call you guys?

16  **A.**   I never actually held the book or opened it, so I'm not

17  sure.

18  **Q.**   Well, you don't remember the title?

19  **A.**   I believe the title was, What Is Islam, if I remember

20  correctly.

21  **Q.**   Like a school textbook or like an --

22  **A.**   I'm not sure, sir.

23  **Q.**   Some of the other Flippy Mapper YouTube videos are hand

24  animated little stick figure figures.  Have you watched those?

25  **A.**   I have seen some of those, yes, sir.

1  **Q.**  Similar to the drawing we saw on the other exhibits that

2  appeared like the stuff from the jail cell.

3  **A.**  I'm not sure which one you are referring to, sir.

4  **Q.**  The little stick figure with the person and the bat and

5  the dog and all of that.  Were those drawings similar to the

6  ones that he had put online?

7  **A.**  No, sir.  Not that I have seen.

8        **MR. RANDALL:**  Thank you, sir.  I don't have any

9  further questions.

10       **THE COURT:**  Redirect.

11       **MR. PRINCIPE:**  No additional questions -- one yes,

12  Your Honor.

13                **REDIRECT EXAMINATION**

14  **BY MR. PRINCIPE:**

15  **Q.**  Was Mr. Treisman himself asked about an Asperger's

16  diagnosis or any mental health conditions at any point?

17  **A.**  Yes, sir, he was.

18  **Q.**  When was he asked about it and what did he have to say

19  about it?

20  **A.**  During the interview with myself and another FBI agent on

21  the 29th of this year of May, he said he did not have anything,

22  any diagnosis.

23  **Q.**  Okay.

24       **MR. PRINCIPE:**  That's it, Your Honor.

25       **THE COURT:**  Redirect, recross?

1          **MR. RANDALL:**  No, Your Honor.

2          **THE COURT:**  You may step down.

3          **THE WITNESS:**  Thank you, Your Honor.

4          **THE COURT:**  Any other witnesses for the Government?

5          **MR. PRINCIPE:**  No, Your Honor.

6          **THE COURT:**  Witnesses or evidence for the Defendant?

7          **MR. RANDALL:**  If I may have just one moment.

8          May we have a break for about five minutes or so?

9          **THE COURT:**  We'll take a ten minute recess.

10         (Recess was taken.)

11         **THE COURT:**  All right, Mr. Randall.

12         **MR. RANDALL:**  As far as a formal presentation, the

13   Defense is not going to make one.  We would have a proffer as

14   to a facility in which Mr. Treisman -- or we're hoping to get

15   him into.  If I may defer to Ms. Cobb, she can tell the Court a

16   little bit about that.

17         **MS. COBB:**  MS. COBB.  Thank you, Your Honor.  We've

18   actually been looking at several facilities, but the one that I

19   have kind of the most information on and the one that actually

20   does have a bed available for him is called Alpha Human

21   Resources.  It is located about a half-hour south of

22   Minneapolis.

23         It is a -- I guess a facility where it is considered

24   minimum security for the purposes of Minneapolis or Minnesota

25   Department of Corrections.  It is not necessarily barbed wires

1   or anything, but they have half-hour head checks, 24 hours a

2   day, manned 24 hours a day with staff.  Its resources are

3   geared towards men with charges either pretrial or people just

4   needing continuing treatment for sex offenses and sexual

5   issues.

6           They have the ability to not only do evaluations to

7   determine what some -- what issues someone might have, but also

8   have the resources to formally treat someone.  They've got a 90

9   day evaluation, as well as, you know, people stay up to a year

10  and a half.  In speaking with them, you know, as I said, they

11  do have a bed available now.

12          Logistics would be just to be working it out, if Your

13  Honor would consider some sort of custody release to their care

14  or another facility, if Your Honor is willing to have him go to

15  Minneapolis to allow him pretrial placement pending the trial

16  in this matter.

17          **THE COURT:**  Is this a presumption case?

18          **MS. COBB:**  No, your Honor.

19          **MR. PRINCIPE:**  I believe it is, Your Honor.  I've

20  seen both sides.  In the Western District they don't treat it

21  as such.  I've seen other cases that do treat it as such.

22          I think technically it is a crime of violence under

23  the statute, though.

24          Your Honor, if I may, I would like to point the

25  Court's attention to 18 U.S.C. 3142(e)(3)(E), Your Honor, which

```
1   it discusses an offense involving a minor victim under
2   section -- and it lists multiple different sections, but it is
3   including 2252(a)(1), which is the transportation of child
4   pornography, and it includes -- the testimony clearly includes
5   evidence of a minor victim, but the statute, it just lists the
6   statute itself.
7            We also have direct evidence that there was minor
8   victims, prepubescent minors involved in that content.  So I
9   think it falls under the presumption because of that
10  subsection, Your Honor.
11           THE COURT:  Did you want to argue further?
12           MR. RANDALL:  That would be our showing, would be the
13  proffer.
14           THE COURT:  All right.
15           MR. RANDALL:  I'm more than happy to argue our
16  position, if Your Honor would like.
17           THE COURT:  It is totally up to you.
18           MR. RANDALL:  Yes, Your Honor.  If it is a
19  presumption case, I would argue to Your Honor that the proffer
20  about the Alpha House placement in Minneapolis would rebut
21  that.
22           I would suggest to the Court that there are
23  conditions or accommodations of conditions which would
24  reasonably assure Alex's appearance in court and reasonably
25  assure the safety to anyone in the community.
```

1          Placement at the Alpha House, it is -- I believe it

2     is certified by the Minnesota Department of Corrections.

3          **MS. COBB:**  And it is a minimum security facility.

4          **MR. RANDALL:**  There is house arrest, reporting to the

5     probation office in that district.  Restrictions on use of cell

6     phones, computers.  Any other types of sex offender conditions

7     that this Court would impose upon him.  Mental health

8     assessment, recommended treatment with that.

9          We believe that the Court can fashion accommodations

10    and conditions that would achieve those goals.

11         **MS. COBB:**  If I may, Your Honor, just briefly.  In

12    speaking with Alpha House, they did report that they had a

13    relationship in working with probation offices in the

14    Minneapolis area.  So essentially working with law enforcement

15    to make sure that whoever is required to, within that facility

16    is coordinating with their appropriate supervisory agencies,

17    and one of the conditions of staying there is you are not

18    allowed to leave the facility.  There are no furloughs.  There

19    are no day trips.  It is on-site, 24-hour supervision, Your

20    Honor.

21         **THE COURT:**  I think I heard the Government offer the

22    pretrial services report, but do you all have any objection to

23    any part of or portion of that document?

24         **MR. RANDALL:**  I didn't see anything that was

25    objectionable in there, Your Honor.

1        **THE COURT:**  All right.  All right.  Thank you.  I'll

2  hear from you, Government.

3        **MR. PRINCIPE:**  Thank you, Your Honor.  We would ask

4  for this Court to detain him not only because there is

5  presumption of detention here that has, in my opinion clearly

6  not been rebutted, but as Your Honor saw through the lengthy

7  testimony, the exhibits, the items recovered from his various

8  devices, his conduct, the reported interviews of numerous

9  people who know him, this gentleman, Mr. Treisman, is young,

10  but he is intelligent.  He is independent.  He's capable.  He's

11  deceitful.  He's uses false identifications.  He's traveled

12  internationally.  He signed leases under a false identity in

13  another country.

14        He has access to the hundreds of thousands of dollars

15  through inheritance that he took out in cash, and it is unclear

16  if that's the full inheritance that he had, full access of his

17  assets, whether he still has access to some of that money or

18  not, or whether his mother or some other family member might

19  afford him access to cash.

20        His own mother on that jail recording was encouraging

21  him to jump bail.

22        There is videos of him talking about flying planes

23  into buildings and how you can do it.  He's not only talked

24  about mass shootings, mass violence, assassination of a

25  presidential candidate a month before an election, he traveled

1   to within 4-miles of Joe Biden's residence in Delaware.

2          He's been talking about doing a mass shooting or

3   school shooting for a lengthy period of time.  Mr. White was

4   concerned that when he showed up unexpectedly, he might be

5   there to take out some kind of revenge against him.

6          All of this started around the time that he was added

7   as a pedophile.  And then he started this journey where he

8   basically, you know, whatever limited roots he had, and why was

9   he even in Southern California for just a few weeks, to get a

10  California Drivers License.  Why does he have multiple drivers

11  licenses from multiple states?

12         I think there is a huge and clear flight risk.  I

13  think he could up out of that facility in Minneapolis, if

14  that's where you were to send him, and he could disappear and

15  he could go to another country.  Might never see him again.

16  Might never stand trial for the child pornography crimes that,

17  I believe, it is extremely strong that he committed.

18         In addition to that, there is a clear danger not only

19  to the general public because of his proclivity, fantasy, and

20  fascination with mass shootings and mass violence and

21  assassination and terrorism, but there is also specific threats

22  to identifiable individuals related to the case; the State

23  prosecutor who is prosecuting his State child pornography

24  charges.  You have the threats against the bank employees who

25  reported the van that started this whole thing.  You also have

other individuals who have given statements to law enforcement now that he's aware of, people that he may have already had some beef with because of him being outed as a pedophile. There is numerous people that could be in danger if he is released.

Your Honor, he has access to firearms. He knows how to get them. He knows how to use them and he's expressed multiple times over that he fantasizes, desires to commit an act of mass violence.

I think the risk of danger is extraordinary. I think the risk of flight is extraordinary, and on top of this is a presumption that he should be detained.

I think if you needed anything above and beyond all this, there is his Perfect Porn, his own personal fantasy and, you know, based on his child pornography, that he has the desire or sexual interest in this content, in this material, and then you have the recording of what in his mind is his perfect fantasy, the perfect pornography, and it involves two random parents driving down the road with a child in their car, killing them with a shotgun, taking a child and then raping them with some claw-type rapper claw device.

What if he decides that with the charges that he's facing, that the potential punishment he is facing, this is his last chance to commit such an act himself, whether it be an act of violence against a child in a sexual assault, or whether it

1  be an act of violence or assassination against some person in
2  our society and in our country.

3          I think the risks are way too high, and that the
4  Court should deny any conditions of release.

5          Thank you.

6          **THE COURT:**  Anything further from the defense?

7          **MR. RANDALL:**  Not at this time, Your Honor.

8          **THE COURT:**  All right.  Thank you.  I have listened
9  carefully to the evidence, the testimony of the two agents that
10 testified on behalf of the Government, reviewed the pretrial
11 services report.

12         I have considered the nature and circumstances of the
13 offense charged, which is very serious.  The weight of the
14 evidence against the Defendant, which is very strong.  The
15 history and characteristics of the Defendant.  I have
16 considered the nature and seriousness of the danger to any
17 person or the community that would be posed by the Defendant's
18 release, and concerns of danger to the community and concerns
19 about whether the Defendant will appear in court.

20         I've also heard arguments by counsel.  I've
21 considered the proffer of the Alpha House in Minneapolis as
22 being a suitable place for him to be released to, and after
23 considering arguments of counsel, I find that the record
24 establishes by clear and convincing evidence, which established
25 that no combination of available release conditions would

1  reasonably assure the safety of the community, and a

2  preponderance of the evidence that no conditions would ensure

3  the Defendant's presence in court, and that is my -- and I

4  believe that his release would be a danger, pose a danger to

5  the community, and that he would potentially be a flight risk.

6          So there is my decision.

7          You may close court.

8          (These proceedings were concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, J. CALHOUN, RPR, United States District Court

4    Reporter for the Middle District of North Carolina, DO HEREBY

5    CERTIFY:

6

7          That the foregoing is a true and correct transcript of

8    the proceedings had in the above-entitled matter.

9

10

11

12   Date:   3-22-22

13                              J. Calhoun, RPR
                                United States Court Reporter
14                              324 W. Market Street
                                Greensboro, NC  27401
15

16

17

18

19

20

21

22

23

24

25